**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William L. WALTON, also known as
Chris Walton; Belle Isle Riding
Academy, Defendants–Appellants.**

No. 89–1706.

United States Court of Appeals,
Sixth Circuit.

Argued May 8, 1990.

Decided July 31, 1990.

Gary R. Allen, Acting Chief, Charles E. Brookhart, Kenneth W. Rosenberg (argued), U.S. Dept. of Justice, Appellate Section, Tax Div., Washington, D.C., for plaintiff-appellee.

Jonathan B. Simon, Donald J. Morbach & Associates, Detroit, Mich., John B. Payne, Jr. (argued), Dearborn, Mich., for defendants-appellants.

Before MARTIN and GUY, Circuit Judges, and DOWD, District Judge.*

RALPH B. GUY, Jr., Circuit Judge.

Defendants, William Walton and the Belle Isle Riding Academy, Inc. (BIRA or the Academy), appeal a district court judgment holding them jointly and severally liable for payment of federal income taxes and fraud penalties assessed by the Internal Revenue Service (IRS). The defendants allege three general grounds for reversal of the court's order: (1) that the tax deficiencies calculated by the IRS for both defendants were arbitrary and excessive; (2) that neither defendant committed civil fraud in failing to pay the assessed taxes; and (3) that there is no basis for disregarding BIRA's corporate identity by holding each defendant jointly and severally liable for the total amount of the judgment against them both. Finding merit in only one of Walton's challenges to the amount of tax assessed, we affirm, but remand for a modification of the judgment.

## I.

Walton is an entrepreneur who appears to have engaged in a wide range of business ventures during the years 1976 through 1979. In this appeal we are primarily concerned with his activities in connection with the Belle Isle Riding Academy, a horse riding concession on Belle Isle Park in Detroit, Michigan, which he founded in early 1976 and incorporated several months later. At all times relevant to this action, Walton was the president and sole director of the Academy.

In July of 1977, investigators from the United States Department of Justice contacted Walton seeking information in connection with a criminal investigation being conducted into possible narcotics trafficking by the only other Academy shareholder, Rondal Rucker.[1] In connection with its investigation, the Justice Department discovered that neither the Academy nor Walton had filed income tax returns for 1976 or 1977, and that the Academy had failed to file at any time between 1976 and 1979. This information was relayed to the Criminal Investigation Unit of the IRS for possible criminal fraud prosecution. The criminal investigation was later dropped and a civil inquiry initiated. After encountering considerable resistance from Walton, including his failure to provide complete business records, IRS Agent Backaitis began to compute the tax liability of both defendants. Due to the inadequacy of the available financial records, Backaitis calculated Walton's taxable income by reconstructing his net worth at the beginning and end of each year for which he had failed to file a return. The IRS completed its audit of Walton in late 1981 and mailed him a notice stating the deficiencies in his tax payments for 1976 and 1977. When Walton did not pay the deficiencies or file a petition in the Tax Court, the IRS assessed taxes, with penalties and interest, yielding a total liability of $140,162.09 for 1976 and $328,079.90 for 1977.

The IRS also reconstructed the Academy's income, using information from the corporation's books and records and from third persons, and mailed BIRA deficiency notices for the years 1976 through 1979. When the Academy failed to pay or contest the deficiencies, the IRS assessed taxes, penalties, and interest of $1,404.21 for 1976, $21,722.45 for 1977, $10,617.76 for 1978, and $13,118.45 for 1979. Both defendants refused to pay the amounts assessed, leading the government to file this suit in the United States District Court for the Eastern District of Michigan to reduce the unpaid assessments to judgment.

After a three-day bench trial, the court rendered judgment against Walton for $468,241.99 and against BIRA for $46,862.88, plus interest, penalties, and costs. The court also ordered that because the Academy was Walton's "alter ego," as evidenced by the commingling of corporate and personal assets and the failure to observe corporate formalities, both defen-

---

* Honorable David D. Dowd, Jr., United States District Court for the Northern District of Ohio, sitting by designation.

1. Rucker was eventually convicted of trafficking in narcotics.

dants would be jointly and severally liable for the full amount of the assessments against each—a total liability of $515,-104.87. After the court denied their request for a new trial, defendants filed this appeal.

II. The Net Worth Method and the Burden of Proof

The Treasury Regulations on Procedure and Administration require each taxpayer to maintain records sufficient to enable the Commissioner to determine his tax liabilities. 26 C.F.R. § 1.6001–1(a). When a taxpayer keeps no books, or keeps books that are inadequate or demonstrably inaccurate, section 446(b) of the Internal Revenue Code authorizes the IRS to compute the taxpayer's income by any method that clearly reflects his income. 26 U.S.C. § 446(b). The "net worth method" used to ascertain Walton's personal tax liability has been accepted by the courts as satisfying the legislative mandate. *See Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The method has not changed since it was described by the Supreme Court in *Holland:*

> In a typical net worth prosecution, the Government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an "opening net worth" or total net value of the taxpayer's assets at the beginning of a given year. It then proves increases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpayer's assets at the beginning and end of each of the years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the Government claims the excess represents unreported taxable income.

348 U.S. at 125, 75 S.Ct. at 130. *See also United States v. Blandina,* 895 F.2d 293, 295 (7th Cir.1989); *United States v. Wirsing,* 719 F.2d 859, 861 n. 4 (6th Cir.1983).

The Commissioner's determination of tax liability, if calculated according to an acceptable procedure, such as the net worth method, is presumptively correct and places the burden of producing contrary evidence upon the taxpayer. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Traficant v. Commissioner,* 884 F.2d 258, 263 (6th Cir.1989); *Calderone v. United States,* 799 F.2d 254, 258 (6th Cir.1986); *Schrader v. Commissioner,* 420 F.2d 443, 444 (6th Cir.1970). Generally, the taxpayer will bear not only the burden of production, but also the burden of proving by a preponderance of the evidence that the Commissioner's assessment is "arbitrary and excessive." *Helvering,* 293 U.S. at 515, 55 S.Ct. at 290; *Traficant,* 884 F.2d at 263; *Calderone,* 799 F.2d at 258. When, for example, the IRS bases an assessment on the disallowance of deductions, "placing the burden of proof on the taxpayer is reasonable because the taxpayer has better access to evidence of the underlying transactions." Note, *Proving a Negative—When the Taxpayer Denies Receipt,* 70 Cornell L.Rev. 141 (1984). Where the taxpayer is confronted with the daunting task of proving that he did not receive income attributed to him in an assessment, however, this circuit has established a less severe rule. In *United States v. Besase,* 623 F.2d 463, 465 (6th Cir.), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 605 (1980), we wrote:

> Where it is a negative assertion that a successful taxpayer would have to prove ... the "law imposes much less of a burden upon a taxpayer." *Weir v. Commissioner of Internal Revenue,* 283 F.2d 675, 679 (6th Cir.1960). Reasonable denials of the assessment's validity have sufficed in such cases to shift the burden back to the government. *Id.* The government then bears the task of substantiating its assessment in cases of this type.

As in *Weir,* the defendants ultimately had to prove their non-receipt of income in order to prevail. They denied the existence of, and the receipt of income

from, a common partnership. They characterized the nature of their relationship as social, and offered testimony to support the explanation. The nature of their proof justified use of the lighter burden and allocation of the ultimate risk of nonpersuasion to the government.

(Citation omitted). *See also Sharwell v. Commissioner*, 419 F.2d 1057, 1060 (6th Cir.1969); *Weir v. Commissioner*, 283 F.2d 675, 679 (6th Cir.1960).

■ Whether the issue in dispute is the taxpayer's receipt of income, in which case the government must bear the ultimate burden of persuasion, or the payment of expenses, in which case the burden of persuasion remains with the taxpayer, the government can never rest its case on an assessment that lacks a minimal evidentiary foundation. In *Helvering*, 293 U.S. at 514, 55 S.Ct. at 290, the Supreme Court wrote: "We find nothing ... that gives any support to the idea that the commissioner's determination, shown to be without rational foundation and excessive, will be enforced unless the taxpayer proves he owes nothing or ... shows the correct amount." In *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the Court explained that debates between the circuits over shifts in the burden of persuasion do "not extend to the situation where the assessment is shown to be naked and without *any* foundation.... Certainly, proof that an assessment is utterly without foundation is proof that it is arbitrary and erroneous." *Id.* at 442, 96 S.Ct. at 3026.[2]

It is a sound principle that "[a] deficiency determination which is not supported by the proper foundation of substantive evidence is clearly arbitrary and erroneous," *Weimerskirch v. Commissioner*, 596 F.2d 358, 362 (9th Cir.1979), and that the Commissioner "cannot rely on the presumption in the absence of a minimal evidentiary foundation" even when the taxpayer offers no concrete evidence. *Id.* at 361. *See also United States v. Zolla*, 724 F.2d 808, 809 (9th Cir.) ("no presumption of correctness

attaches to deficiency determinations in which the IRS charges a taxpayer with additional income but provides no factual showing that the taxpayer actually received the income in question.") (dicta), *cert. denied*, 469 U.S. 830, 105 S.Ct. 116, 83 L.Ed.2d 59 (1984); *Llorente v. Commissioner*, 649 F.2d 152, 156 (2d Cir.1981) ("the evidence of record must at least link the taxpayer with some tax-generating acts...."); *Gerardo v. Commissioner*, 552 F.2d 549 (3rd Cir.1977) ("in order to give effect to the presumption ... some evidence must appear...."). In fact, the Tax Court has held that it will entertain a taxpayer's bare allegation of arbitrariness if the Commissioner has relied solely on the presumption of correctness and does not submit any direct evidence in support of the assessment. *See Llorente v. Commissioner*, 74 T.C. 260, 264 (1980), *aff'd in part and rev'd in part on other grounds*, 649 F.2d 152 (2d Cir.1981); *Jackson v. Commissioner*, 73 T.C. 394, 410 (1979).

■ Here, the government placed certificates of assessment in evidence, to which the presumption of correctness attached, and thereby established a prima facie case. *United States v. Stonehill*, 702 F.2d 1288, 1293 (9th Cir.1983), *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1440, 79 L.Ed.2d 761 (1984). Both taxpayers, therefore, bore the initial burden of producing credible evidence that they did not earn the taxable income attributed to them or of presenting an argument that the IRS deficiency calculations were not grounded on a minimal evidentiary foundation.

The district court found that the taxpayers failed to meet their burden with regard to any of the assessments at issue. That finding is factual and will not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a); *Traficant*, 884 F.2d at 263. Because of its unique opportunity to judge the demeanor of witnesses, we accord particular deference to the district court's findings based on assessments of credibility. Fed. R.Civ.P. 52(a); *Anderson v. Bessemer*

---

**2.** The holding in *Janis* is dicta. The Court was opining as to the effect of refusing to admit evidence that the IRS planned to use to support

its figures in a tax evasion case because of an allegedly unlawful seizure. The seizure ultimately was declared lawful.

*City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

### III. The IRS Assessment of Walton's Tax Liability

Having set out the appropriate burdens of proof and standard of review, we now address each defendant's challenge to the IRS assessments. Walton alleges one error in the calculation of his income for 1976—that his investment in the Academy during the year was overstated—and three errors in the 1977 figure: (1) the IRS's calculation of money owed to him by the Academy in 1977 was arbitrary and excessive; (2) an airplane was erroneously designated as his personal asset and inaccurately listed free of liabilities in his 1977 net worth calculation; and (3) a house owned by the Academy was treated as an asset acquired by Walton personally in 1977. The only documentary evidence Walton presented at trial in support of these claims was a note associated with the purchase of the airplane. With regard to his other arguments, Walton has relied on documents introduced by the government and on his own testimony.

### A. *The Net Worth Determination for 1976*

In determining Walton's net worth for the year 1976, the IRS found that at the opening of the 1976 tax period, Walton had no money invested in BIRA, while by the end of the year he had an investment of $132,674. Walton asserts that he invested only $8,000 in BIRA during 1976, and that this fact is demonstrated by the government's own exhibits. As we are without the benefit of the district court's findings on this issue, we proceed to a direct consideration of the evidence on record.

The government introduced three documents upon which the parties rely. The first is an undated bill of sale stating that Walton "has sold and hereby conveys" to BIRA assets listed in an attached schedule with a total value of $132,674. The bill of sale also provides that "the above stated conveyance and sale is subject to Belle Isle Riding Academy Inc., expressly agreeing" to pay liabilities set forth in the accompanying schedule.

The second document, government exhibit 19, is a letter from Walton to BIRA's board of directors reading as follows:

Re: Offer By Proprietor to Corporation
Gentlemen:

I, the sole proprietor of a horse riding business operating under the name of Belle Isle Riding Academy Inc. [sic]

Attached hereto is a[n] instrument showing the assets and net worth of my sole proprietorship as of November 30, 1976.

I hereby offer to transfer to your corporation all such assets, subject to all liabilities, on the following conditions....

Finally, government exhibit 20 is the minutes of the annual meeting of the Academy's shareholders held December 1, 1976. The minutes list Walton as the sole shareholder of the corporation. They refer to the bill of sale and state that Walton "declined to sign over all the necessary documents to effectuate such transfer of assets and items aforesaid." According to the minutes, Walton only transferred $8,000, and therefore received only 4,000 shares of stock.

These three documents appear to tell the following story. On November 30, 1976, Walton personally owned the assets in the schedule attached to the bill of sale with a total value of $132,674. He was, at that time, engaged in changing the legal status of the Academy from a sole proprietorship to a corporation. After filing BIRA's Articles of Incorporation with the Michigan Secretary of State on October 18, 1976, he contracted, as the sole proprietor of the Academy, to sell the assets of his business to the corporation he had established, with himself as sole director, in exchange for stock in the corporation. The assets were, for whatever reason, never legally transferred, and the stock was never issued.

█ Walton claims that because the government exhibits show that the sale of assets never took place, the assets were improperly included in his net worth calculation. The conclusion does not follow

from the premise. The only relevance of the sale of assets to the computation of net worth is that it is reasonable to presume that if Walton transferred $132,674 in assets to BIRA in November of 1976, he owned $132,674 in assets to transfer. The government did not need to show that the *transfer* of assets from Walton to the corporation ever took place, so long as they showed that Walton *owned* $132,674 in assets in November of 1976 that he did not own in 1975.[3] Walton's ownership of the assets is revealed by government exhibit 19 in which he claims that the schedule listing total assets of $132,674 represents "the assets and net worth of my sole proprietorship as of November, 1976." Having found that Walton owned $132,674 in assets in November of 1976 that he did not own at the beginning of that year, the IRS appropriately included these assets in its net worth calculation. Walton was free to come forward with evidence that he owned the listed assets before 1976, or that he did not own them at all. He did not do so. Accordingly, the district court's determination that Walton had not met his burden of proof on the issue was not clearly erroneous.

## B. *Net Worth Determinations for 1977*

The IRS determined that Walton's personal net worth was $96,917.82 at the beginning of 1977 and $364,491.48 at year's end, reflecting an income of $267,573.66. Walton challenges $196,914.61 of this increase based on the inclusion of three assets in his net worth at the end of 1977: (1) accounts receivable from the Academy of $140,414.61; (2) $21,500 as the selling price of an airplane; and (3) $35,000 as the selling price of real estate on Strathcona Drive, Detroit. We address each claim of error in turn.

### 1. $140,414.61 in Accounts Receivable from BIRA

■ The defendant argues that inclusion in the net worth calculation of $140,414.61 in accounts receivable from BIRA is an arbitrary figure that is flatly contradicted by the only relevant evidence in the record —BIRA's general journal entry for 1977.[4] The journal for 1977 indicates that the only account payable to Walton in 1977 was in the amount of $24,000. We agree that, on the record now before us, the figure appears arbitrary. The government did not come forward with any foundation for the figure at trial and, on appeal, contends only that "[t]he record is inconsistent and inconclusive with regard to the amounts the Academy owed Walton." Simply because a figure in a net worth analysis appears arbitrary on appeal, however, is not sufficient to merit reversal.

As set out at length above, an assessment is presumed correct, and the plaintiff bears the initial burden of producing evidence at trial to show that an assessment is arbitrary or excessive. We do not doubt that this burden may be met by the defendant pointing out that an element of a net worth calculation is wholly without foundation or is flatly contradicted by another of the government's exhibits. The government would then bear the burden of coming forward with a minimal evidentiary foundation for the assessment. In this case, however, the defendant never met his minimal burden of production. Walton's attorney never cross-examined Agent Backaitis to determine how he arrived at the figure of $140,414.61 in accounts receivable from BIRA. Nor did he bring the conflict between the assessment and the journal

---

**3.** The government contends that the transfer of assets did take place. It refers to BIRA's annual report to the State of Michigan for 1977 which states that the Academy had paid-in capital of $167,674. The annual report is not contained in the record of this case, however, and we are therefore unable to consider it as evidence.

**4.** The defendant also contends that he owes no tax on the $140,414.61 because "[t]axpayers on a cash basis are not required to pay taxes on money owed to them and payable in the future. Income taxes are only payable on income received by the taxpayer." This argument wholly misses the relevance of this sum in the net worth calculation. The increase in the Academy's debt to Walton is relevant because it represents a transfer of $140,414.61 from Walton to the Academy in 1977, an amount presumed to have come from taxable income earned by Walton during that year.

entries to the attention of the court or the government, which would have afforded the government an opportunity to explain or reconcile the difference. In fact, the only challenge to this figure appearing in the record is a colloquy between the defendant and his attorney on direct-examination occurring after Backaitis had been called and cross-examined:

Q. Do you have any additional objections to the net worth assessment made by Mr. Algis A. Backaitis with respect to yourself with respect to the years 1976 and 1977?

A. 1977, as I stated, the $132,000 was not correct, the accounts receivable, Belle Isle Riding Academy he has an amount of $140,414.61 owed me and I don't know what that's for. I know they don't owe me nothing.

This vague denial, which was modified moments later when Walton acknowledged that BIRA did owe him $24,000, was certainly not sufficient to meet the defendant's burden of production on the issue of arbitrariness. Had BIRA's general journal entry for 1977 been brought to the attention of the court on this particular issue at trial, and had Agent Backaitis been unable to explain how he had arrived at the figure of $140,414.61 in accounts receivable, we would agree with Walton's contention that the figure is arbitrary and excessive. As the case stands, however, the defendant did not meet his initial burden, and the court properly found in favor of the government on this issue.

2. The Airplane

■ Walton alleges two grounds of error in the Commissioner's inclusion of a Grumman–American Cheetah aircraft with a cost of $21,500 in Walton's net worth for 1977: first, that he did not own the airplane which belonged to the Academy; and second, that the asset was listed free from any liabilities in the Commissioner's net worth calculation in the face of documentation proving that $22,976.40 was owed on it.

In support of his first argument, Walton notes that the Academy's name is listed on the application for the plane's registration, that the Academy is referred to as the purchaser on a financing agreement, and that the plane was paid for with checks from the Academy's account. While acknowledging that the airplane was legally titled in the name of the Academy, the Commissioner maintains that the aircraft served no legitimate business purpose, and that it therefore must be considered as Walton's personal property for purposes of net worth calculation. Walton responds that he used the plane in his capacity as president of BIRA to attend feed sales. Acknowledging that he was not obliged to personally attend the sales in order to purchase feed, Walton claims that his presence allowed him to obtain the telephone numbers of feed dealers who gave him a better price on hay for the Academy's horses. The defendant's testimony to this effect at trial was flatly contradicted by his prior deposition testimony.[5]

The district court found in favor of the government, writing:

First, the Court is hard pressed to accept that the cost of operating a plane and the time expended in travelling from the Northwest side of Detroit to Detroit City Airport and then to Ann Arbor, Michigan to be picked up and transported to Howell, then back to Ann Arbor airport to be flown to Bad Axe justified the expenditures for the plane. Walton testified that the plane saved the Academy money by allowing him to get phone numbers of individual dealers and to negotiate sales with them individually. Yet, he provides the Court with absolutely no proof of the costs saved by these endeavors. In absence of documentation, the Court finds this explanation to be not merely implausible but absurd.

The defendant argues that this finding is clearly erroneous in that the government's own assessments for BIRA show that its expenses for feed decreased steadily from

---

5. In a deposition taken in September 1988, Walton stated that the business purpose of the plane was to look for hay fields.

1977 through 1979. Walton's argument that the plane was the cause of reduced feed prices in 1979 is disingenuous, to say the least, in light of the fact that Walton sold the plane in August 1978. In any event, numerous reasons, totally unrelated to the purchase of the airplane, could have accounted for the reduction in the total expenditures for feed in 1978. In light of the fact that Walton has come forward with absolutely no evidence besides his own contradictory testimony, the district court properly found that the asset belonged to Walton rather than BIRA.

■ Walton's second claim of error with regard to the airplane has more merit. In the government's net worth calculation, the plane was listed as an asset, acquired in 1977, with a value of $21,500. The calculation does not include any liabilities attached to the airplane. It is evident, therefore, that the IRS computed Walton's net worth with the understanding that he had paid the entire cost of the airplane in 1977. Walton produced convincing evidence at trial that the airplane was in fact purchased by way of a security agreement. According to a conditional sales contract with Grumman Credit Corporation, dated December 26, 1977, Walton paid $4,300 in cash for the airplane on that date and agreed to pay the remainder of the $21,500 purchase price in 60 equal successive monthly installments of $382.94 each, beginning February 1, 1978. Walton also entered into evidence four checks, each for $382.94, made payable to the Grumman Credit Corporation and bearing the dates of the first four months in 1978.

This evidence was clearly sufficient to shift the burden to the government to produce evidence that inclusion of the total purchase price was not arbitrary or excessive. It is apparent that the government never met this burden; in fact the government appears not to have addressed the issue at all during the remainder of the trial. Under these facts, we believe that the district court abused its discretion by refusing, *sub silentio*, to reduce the defendant's tax burden to reflect the liabilities owed on the airplane.[6] The court's judgment should be modified accordingly on remand. *See Gerardo v. Commissioner*, 552 F.2d at 555.

### 3. The House on Strathcona Drive

■ Walton's final challenge to his personal net worth calculation is that it includes $35,000, representing the purchase price of a house on Strathcona Drive in Detroit. Walton argues that BIRA had legal title to the property and that it was therefore improper for the Commissioner to consider the price of the house in Walton's personal net worth calculation. The government contends that the legal ownership of the house is irrelevant. It maintains that the dispositive fact is that the property was purchased and maintained solely for Walton's personal use. Walton responds that the property was purchased by BIRA purely as an "investment," and that he personally never lived there.

The government's evidence is overwhelming. At trial, the defendant admitted that the house was furnished as a residence and that much of his personal and business correspondence was delivered there. Although Walton denied actually "living" at the Strathcona residence, he testified that he had slept there on occasion, had met acquaintances at the house, and had cooked some of his meals there. The defendant claims that these actions can be explained by the fact that he wanted to give the house a "lived in" appearance in order to prevent vandalism. The district court was understandably impatient with this explanation.

The defendant listed the house as his personal residence on the Academy's 1979 annual report to the State of Michigan, on his application for a State of Michigan driv-

---

6. The judge took cognizance of the documentary evidence the defendant produced at trial. He stated to the defendant's counsel during the trial: "[Y]ou disagree with the airplane and brought in something that showed he owes as much, perhaps, as he got for the airplane, that was an attack on the underlying issue." After posing the issue, however, the judge made no findings either from the bench or in his written opinion as to the accuracy of the net worth assessment in light of the evidence regarding the aircraft.

er's license, and on a promissory note given to a lending institution in exchange for financing on a boat. A female companion of Walton's recorded the property as her home address on the registration of her own automobile. Walton explained that the woman had never lived there, but that he had given her the car as a gift and that the Strathcona address had been used because the woman's daughter was the housekeeper there. Walton never explained why BIRA required a housekeeper to maintain a piece of property that was not being used as a residence.

BIRA's purported business purpose in purchasing the house as an investment is belied by the fact that the property was never rented out.[7] Based on this record, the district court found that:

> The Strathcona property is a classic example of an asset that served no legitimate purpose whatsoever for the Academy....
>
> ... Walton was using the Strathcona house as his personal residence.... The Court finds incredulous defendant's expectation that the Court would believe that Walton did not live there even though he directed his mail to that address, and never received any rental income from it.

Our review of the record convinces us that the district court's finding with respect to the Strathcona property was fully supported by the great weight of the evidence. Having disposed of Walton's complaints with regard to the assessments levied against him personally, we proceed to a consideration of BIRA's tax liability.

### IV. The IRS Assessment of Belle Isle Riding Academy's Tax Liability

The Academy presents us with four arguments in its brief on appeal: (1) that it has no tax liability at all because it made a timely election under subchapter S of the Internal Revenue Code; (2) that the IRS acted unreasonably in disallowing expenses BIRA incurred during the contested years

when calculating the corporation's taxes; (3) that the IRS improperly attributed income from a bicycle rental concession to the corporation rather than to Walton personally; and (4) that the court ought to have followed the findings of a second IRS audit conducted on BIRA rather than the audit performed by Agent Backaitis.

BIRA first contends that it was not subject to taxation in the years 1976–1979 because it had executed a valid election as an S corporation under the terms of the Internal Revenue Code. 26 U.S.C. §§ 1362 and 1363. Corporations having made such an election are not taxed as separate entities. 26 U.S.C. §§ 1363 and 1366.

The Academy raised this issue for the first time in its reply to the government's response to the Academy's motion for a new trial. In fact, all the evidence BIRA has adduced in support of its status as an S corporation was introduced only after the conclusion of the trial. A district court's refusal to grant a new trial will be reversed only for an abuse of discretion. *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir.1989). As one commentator has written, in a civil action, "[a] principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2805 (1973); *see also Nissho–Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir.1988); *Computer Sys. Eng'g, Inc. v. Quantel Corp.*, 740 F.2d 59, 69 (1st Cir.1984). There was no gross injustice here. BIRA had access to all the documents it relied on in its motion for a new trial before this action was ever commenced. The court therefore acted properly in denying BIRA's motion for a new trial based on its filing status.

BIRA next argues that even if it is subject to taxation, the Commissioner erred in computing its tax liability. As noted

---

7. Walton maintains that it was not rented because improvements were required before occupancy was permitted under an agreement with the seller of the house. Walton has made no showing that any repairs were required or ever performed.

above, the IRS calculated BIRA's tax liability by reconstructing its income and expenditures based upon information obtained from the Academy's books and records and from third persons. The Academy apparently has no quarrel with the income figures the IRS has produced; it takes issue only with the government's refusal to deduct the amount of certain expenses from these figures before computing the taxes owed. The IRS agent who performed the audit on BIRA testified at trial that because Walton did not furnish him with sufficient information to determine the Academy's tax liability, he was forced to rely on information obtained from third persons. The agent explained that he was unable to obtain records of BIRA's expenses from BIRA's accountant because BIRA had not authorized the accountant to discuss the matter with the IRS.

■ On appeal, BIRA maintains that the IRS ought to have requested such authority from Walton, and that by failing to do so it did not meet its burden of proving that the expenses listed in BIRA's books and records were inaccurate. As explained earlier, the taxpayer, not the government, bears the burden of persuading the trier of fact that the IRS has improperly disallowed deductions from income. BIRA failed to adduce any evidence whatsoever at trial in support of the validity of the expenses claimed on its books. Accordingly, the district court correctly accepted the government's determination of BIRA's expenses.

■ The Academy contends that income from a bicycle rental concession was improperly included in the IRS's calculation of its income. BIRA relies on the fact that Walton signed the contract for the concession with the City of Detroit and gave no indication on the document that he was acting in his capacity as an officer of the Academy. The district court found that, in view of the extensive commingling of assets between Walton and BIRA, the form of the signature was not dispositive. We agree.

It is undisputed that the bicycle rental concession was operated on the grounds of the Academy, and that Walton paid the Academy no rent for the space. Nor does BIRA contest the fact that its ledger contained an account entitled "Bicycle Rental" which included entries totaling over $3,000. On the basis of this evidence, we agree with the district court that income from the concession was properly attributed to the Academy.

■ Finally, the Academy argues that the district court erred in refusing to admit working papers prepared by a second IRS investigator who had audited the Academy. BIRA contends that these papers reveal that the corporation earned no income and therefore owes no tax. BIRA's counsel called the IRS agent who performed the second audit, Robert L. Gardner, to the stand during trial. Gardner testified that the figures contained in his working papers were not necessarily accurate because they reflected certain concessions made for the purpose of settlement negotiations. When Walton's attorney attempted to elicit testimony regarding the amount of liability shown in the second examination, government counsel objected on the grounds of relevance. The court sustained the objection. Agent Gardner then testified that, after examining the records of the Academy and the results of the first IRS audit, he believed that the original audit contained no errors. Given Gardner's testimony, we can see no relevance in his working papers. In any case, the trial judge is accorded broad discretion in determining whether evidence should be admitted based on considerations of relevance and materiality. *Bowman v. Koch Transfer Co.*, 862 F.2d 1257, 1262 (6th Cir.1988). We review only for abuse of discretion, *id.*, and find none here.

## V. Fraud Penalties

■ The Internal Revenue Code, 26 U.S.C. § 6653(b), imposes a penalty on any taxpayer whose underpayment of a tax is due to fraud.[8] The United States bears the

---

**8.** 26 U.S.C. § 6653(b) has undergone several amendments, applicable only to taxes due after

the taxes at issue here, that have modified the procedure for calculating fraud penalties. The

burden of proving fraud by clear and convincing evidence. *Traficant*, 884 F.2d at 264; *cf.* 26 U.S.C. § 7454(a) (the Secretary bears the burden of proving fraud in the Tax Court). We will set aside a finding of fraud under section 6653(b) only if it is clearly erroneous. Fed.R.Civ.P. 52(a); *Traficant*, 884 F.2d at 264; *Solomon v. Commissioner*, 732 F.2d 1459, 1461 (6th Cir.1984).

■ To support a finding of tax fraud, the government must show that the taxpayer has engaged in conduct with the intent to evade taxes that he knew or believed to be owing. *Traficant*, 884 F.2d at 264. Because fraudulent intent is "never, or at least rarely, admitted," *Biggs v. Commissioner*, 440 F.2d 1, 5 (6th Cir.1971), the courts must generally rely on circumstantial evidence. *Traficant*, 884 F.2d at 264. Accordingly, fraud may be inferred from "any conduct, the likely effect of which would be to mislead or conceal." *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943). The courts have relied on numerous indicia of fraud in deciding cases under section 6653(b). Of particular weight is a taxpayer's failure to file a tax return. As we noted in *Solomon*, 732 F.2d at 1461, "[w]hile failure to file is not in itself sufficient to prove fraud, it is persuasive circumstantial evidence of fraud when coupled with other indicia or 'badges' of fraud." (citations omitted). Many of these other indicia were also set out in *Solomon:*

> A second factor is a taxpayer's failure to report income over an extended period of time. A taxpayer's failure to furnish the Government with access to his records is also a factor. Another consideration is a taxpayer's failure to keep adequate books and records. Further evidence is

taxpayer's experience and knowledge, especially knowledge of tax laws. A taxpayer's concealment of bank accounts from Internal Revenue agents is yet another sign indicating fraudulent intent.

732 F.2d at 1461–62 (citations omitted). In addition, the courts have considered implausible explanations of conduct given at trial to be a strong indication of fraud. *See, e.g., Bahoric v. Commissioner*, 363 F.2d 151, 153–54 (9th Cir.1966).

■ The district court found that Walton acted fraudulently based on the fact that he had (1) failed to timely file tax returns for himself or BIRA, (2) failed to maintain adequate personal or corporate business records, (3) commingled his personal assets with those of BIRA in an attempt to avoid tax liability, and (4) refused to cooperate with the IRS in its investigation. The defendants have failed to show clear error in any of these findings.

Walton filed no personal federal income tax returns for the 1976 and 1977 tax years. Pursuant to the IRS investigation, Agent Backaitis visited BIRA several times, asking to speak with Walton. Backaitis was told on each occasion that Walton was not there, by a man who he later discovered was Walton himself. When Backaitis subsequently confronted him, Walton denied having received any income during the years at issue and failed to provide any records to aid in the computation of his tax liabilities. He told the IRS agent that he owned no assets and had no income. He also told the agent that his accountant was preparing his tax returns, and that they would be filed shortly. As of the date of the trial, however, these returns had not been filed.

---

most significant has been the increase in the basic penalty from 50 percent to 75 percent of the underpayment. The relevant portion of section 6653(b) governing imposition of fraud penalties for failure to pay taxes due between 1971 and 1982 reads:

> (b) FRAUD.—If any part of any underpayment ... of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment....

With regard to taxes due after December 31, 1986, section 6653(b) provides as follows:

> (b) FRAUD.—
> (1) In general.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

At trial, Walton testified that he had mailed tax returns for BIRA for its 1976 through 1979 tax years to the IRS in 1980. The IRS, however, received no such returns until 1987. When Walton eventually did provide records of his own personal dealings and those of BIRA, they were uniformly inaccurate.[9] As was shown in our consideration of the house on Strathcona Drive, the Grumman aircraft, and the bicycle rental concession on Belle Isle, there was extensive commingling of assets between Walton and the Academy.

At the conclusion of the trial, the court stated:

Mr. Walton's story is the most incredible, the most nonsensical, child-like story that I ever heard in almost five years on the bench. It's an insult to this court to bring in that kind of discussion. I don't think anybody could possibly believe it. It's unbelievable under any stretch of the imagination.

We must agree. Walton has a college education and has operated several businesses. It is evident that his unusual business practices were not the result of ignorance, but were undertaken with the intent to avoid paying taxes that he knew were owed. *See Solomon,* 732 F.2d at 1461–62. The court correctly found that the government had met its burden of proving fraud.

## VI. Joint and Several Liability

■ As noted above, in its December 27, 1988, judgment, the court granted all relief that the government had requested in its complaint. At the government's request, the court amended the judgment on January 19, 1989, to state that both defendants were jointly and severally liable for the sum of the judgments rendered against each.[10] The court explained:

This sum is in accordance with the Court's finding that Belle Isle Academy, Inc. was the alter ego of William Walton, as evidenced by the commingling of corporate and personal assets and the disregard of corporate formalities. William Walton and Belle Isle Riding Academy will therefore be held jointly and severally liable for the full amount of the tax assessments.

The defendants maintain that this ruling must be reversed because joint and several liability was not requested in the government's complaint and because "fairness and justice" argue against piercing the corporate veil in this case. We find no merit in either objection.

Rule 54(c) of the Federal Rules of Civil Procedure provides:

Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.

Whether or not the government requested joint and several liability in its complaint, the court had the power to grant it.[11]

A corporation and its shareholders are generally deemed to be separate entities for tax purposes. That rule is "subject to the qualification that the separate identity may be disregarded in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 442, 54 S.Ct. 788, 791, 78 L.Ed. 1348

---

9. For example, the Academy's books record a cash receipt of $60,000, described as "cash sales of horses and saddles." There was no record for the cost of the horses.

10. The judgment against Walton personally was $468,241.99. The judgment against BIRA was $46,862.88. The January 1989 memorandum and order stated that "the Court's judgment should reflect a judgment entered against William Walton and Belle Isle Riding Academy, Inc. for the sum of the assessments against both defendants; namely, $515,104.87."

11. We find no showing of prejudice to the defendants because joint and several liability was not requested in the government's initial pleadings. The issues relating to piercing the corporate veil were nearly identical to those involved in determining whether Walton's conduct was fraudulent under 26 U.S.C. § 6653(b). The defendants were fully prepared to oppose the government's motion.

(1934) (citations omitted). The courts have consistently held that a corporation may be treated as a separate entity for purposes of assessing a corporation tax, while its identity is disregarded for the purpose of satisfying that assessment *See, e.g., Wolfe v. United States,* 798 F.2d 1241, 1243 (9th Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3210, 96 L.Ed.2d 697 (1987); *Harris v. United States,* 764 F.2d 1126, 1128 (5th Cir.1985).

In determining whether the separate corporate identity should be disregarded, each case is *sui generis* and must be decided in accordance with its own underlying facts. *Lettinga v. Agristor Credit Corp.,* 686 F.2d 442, 446 (6th Cir.1982). The courts have employed a number of criteria in determining whether a corporation is an alter ego justifying piercing the corporate veil. Such criteria include: (1) the absence of normal corporate formalities, *see, e.g., Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984); (2) commingling of personal and corporate funds, *see, e.g., Labadie Coal Co. v. Black,* 672 F.2d 92, 98 (D.C.Cir.1982); (3) siphoning of corporate funds by a dominant stockholder, *see, e.g., Solomon v. Klein,* 770 F.2d 352, 353–54 (3rd Cir.1985); and (4) the fact that the corporation is merely a facade for the personal operations of the dominant stockholder, *see, e.g., Solomon v. Klein,* 770 F.2d at 354; *Labadie Coal Co. v. Black,* 672 F.2d at 97.

Each one of these factors justifies disregarding the corporate form in this case. BIRA clearly failed to observe corporate formalities. The bookkeeping records of the corporation were woefully inadequate, as illustrated by the fact that there was virtually no documentation at all of the corporation's activities during 1977.

Walton has admitted to extensive commingling of personal and corporate assets. The admission is supported by numerous facts on the record. As noted above, Walton made personal use of assets nominally owned by the Academy including the Strathcona house,[12] the Grumman aircraft, and several luxury cars.[13] Walton also admitted on the record that he had used corporate funds to pay personal obligations, and that certain sales recorded on the Academy's books were in fact for his personal account.

From these facts it is clear that Walton, who at all times had exclusive control over BIRA, used the assets of the corporation as if they were his own and attempted to hide his own holdings under the veil of the corporate form. These circumstances justified the district court in piercing the veil and holding Walton and the Academy jointly and severally liable for the full amount of taxes and penalties owed by each.

The district court's judgment is AFFIRMED in part and REVERSED in part and the case is REMANDED for modification of the tax assessment and fraud penalties against defendant Walton in accordance with section II, Part B.2 of this opinion.

---

**12.** According to Walton's testimony at trial, the house was purchased with cash belonging to BIRA, but which was never placed in a bank or recorded on the Academy's books. The property was carried as an investment on BIRA's books. Walton testified that in 1980 the Academy had mortgaged the property to an individual mortgagee, loaning the proceeds to one of Walton's personal friends.

**13.** Walton stated that he could not recall which vehicles were owned by the Academy and which were his own. When asked about a 1934 Ford and a 1961 Mercedes–Benz that he claimed belonged to the Academy, Walton stated that the business purpose of those vehicles was to attract attention to the Academy by parking them on its grounds.