T.C. Memo. 2000-205


UNITED STATES TAX COURT


PHILIP E. PARSONS AND KAREN PARSONS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9303-97.                     Filed July 5, 2000.


<u>J. Timothy Bender</u> and <u>J. Scott Broome</u>, for petitioners.

<u>Christopher A. Fisher</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows:

| | | Additions to Tax | | | |
| | | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1) | 6653(b)(1)(A) | 6653(b)(1)(B) | 6661(a) |
| 1987 | $18,652 | N/A | $13,989 | [1] | $4,663 |
| 1988 | 10,100 | $7,575 | N/A | N/A | 2,525 |

[1] 50 percent of the interest due on $18,652.00 for tax year 1987.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] we must decide the following issues:

(1)  Whether petitioners are liable for additions to tax for fraud under section 6653(b) for 1987 and 1988.[2]  We hold they are.

(2)  Whether petitioners are liable for additions to tax for substantial understatement of tax for 1987 and 1988.  We hold they are.

_____

[1]  Petitioners have conceded the deficiencies in each year at issue.

[2]  Petitioners have also averred that the sec. 6501(a) 3-year period of limitations on assessment has expired with respect to the years in issue.  Because we conclude that petitioners filed fraudulent returns for each of these years, the period for assessment remains open.  See sec. 6501(c)(1); Murphy v. Commissioner, T.C. Memo. 1995-76; Sisson v. Commissioner, T.C. Memo. 1994-545 ("The definition of fraud for purposes of section 6653 is the same as the definition of fraud for the purpose of extending the period of limitations under section 6501(c)."), affd. without published opinion 108 F.3d 339 (9th Cir. 1996).

FINDINGS OF FACT

At the time they filed their petition, petitioners resided in Pepper Pike, Ohio. Petitioners were married and filed joint returns for the years in issue.

During the years in issue, petitioner Philip E. Parsons was a licensed pharmacist and the president and sole shareholder of Cedar Hill Drug Company, Inc. (Cedar Hill), which operated a pharmacy in Cleveland Heights, Ohio, and, beginning in November 1988, a second pharmacy in Solon, Ohio. Mr. Parsons formed Cedar Hill in 1975 and incorporated it in the State of Ohio in 1981. In addition to filling prescriptions, Cedar Hill sold milk, tobacco, beer, wine, and other merchandise. Mr. Parsons was an employee of Cedar Hill and was issued Forms W-2, Wage and Tax Statement, for the years in issue. Mr. Parsons, as the pharmacist, did not ring up sales on the register, which was operated by other employees. Mrs. Parsons, also a licensed pharmacist, worked at an unrelated pharmacy, and although not an employee of Cedar Hill, she occasionally filled in for Mr. Parsons at Cedar Hill.

During the years at issue, petitioners retained the accounting firm Skoda, Minotti, Reeves & Co. (SMR) to perform bookkeeping and tax consultation services for Cedar Hill, as well as to prepare Cedar Hill's corporate income tax returns and petitioners' personal income tax returns. Joseph F. Skoda was

the SMR partner responsible for petitioners' and Cedar Hill's accounts.

SMR supplied petitioners with forms for the purpose of recording cash transactions in Cedar Hill's operations. These forms were titled "Daily Sales and Cash Report" and were referred to as "pink sheets". The pink sheets provided a means of recording different categories of cash receipts and disbursements so that petitioners and SMR could account for Cedar Hill's cash. The cash disbursement categories included a line denoted "Personal Drawing" for recording cash withdrawn by Mr. Parsons for personal use. The pink sheets also had a line for recording the amount of cash deposited into Cedar Hill's bank account. Mr. Parsons understood the "Personal Drawing" line to be a place for recording money taken out of the register during the course of the day for personal use.

At the end of each business day, Mr. Parsons brought home the register tapes, cash, and receipts from the cash registers at Cedar Hill and gave them to Mrs. Parsons, who then completed the pink sheet record for that day. By comparing the cash and the register tapes from each cash register and shift, it could be determined whether each cashier was properly accounting for his or her cash receipts. Each morning, Mr. Parsons would take the cash that Mrs. Parsons had counted in preparing the pink sheets the previous evening, so he could deposit it in Cedar Hill's bank

account. At some point during the business day, he would deposit cash into Cedar Hill's bank account.

Mr. Parsons did not receive regularly scheduled, pro rata installments of his salary from Cedar Hill. Instead, either Mr. or Mrs. Parsons would take cash from Cedar Hill's proceeds as needed for living expenses. On occasion, Mr. Parsons would remove cash from the Cedar Hill registers during the business day, and either he or Mrs. Parsons would record the withdrawal on the pink sheets on the personal drawing line. In the evening, Mrs. Parsons would sometimes remove cash that had been brought home from Cedar Hill and use it for the Parsonses' personal use. Mrs. Parsons recorded these withdrawals on the pink sheets as personal draws. The withdrawals of cash that were recorded as personal draws on the pink sheets and the value of any business checks written for personal expenditures were tallied at yearend by SMR and offset against the salary due Mr. Parsons. Cedar Hill would then issue a check to Mr. Parsons for any remaining salary due him.

However, not all cash taken by Mr. Parsons from Cedar Hill's proceeds was recorded on the pink sheets. On many occasions, Mr. Parsons would remove cash from the previous day's proceeds that had been counted by Mrs. Parsons the previous evening, had been recorded on the pink sheets as deposited, and was awaiting

deposit into Cedar Hill's bank account.[3]  These withdrawals of cash by Mr. Parsons were not noted as personal draws or otherwise recorded on the pink sheets.  As a result, the pink sheets reflected the cash on hand at the end of each business day but often did not reflect the subsequent cash withdrawals made by Mr. Parsons before making deposits into Cedar Hill's bank account. The total cash withdrawn by Mr. Parsons but not recorded on the pink sheets equaled $57,106 in 1987 and $35,957 in 1988.  Some, but not all, of this money was deposited into Mrs. Parsons' personal bank account.

After the close of each month, Mr. Parsons forwarded that month's pink sheets to SMR.  He also provided handwritten summaries of that month's sales and accounts receivable (the white sheets).  Using the pink sheets, the white sheets, and other records of check transactions, SMR prepared monthly balance sheets, income statements, and general ledger sheets for Cedar Hill.

Mr. Skoda noticed that the amounts recorded for Cedar Hill's accounts receivable could not be reconciled with the cash in Cedar Hill's bank account, nor did the "Cash Deposited" amounts Mrs. Parsons had recorded on the pink sheets match the actual

---

[3] Often, Mr. Parsons would make such withdrawals at the request of Mrs. Parsons, who would call him at Cedar Hill and request that he deposit additional funds in her personal checking account to cover checks she was writing.

amounts deposited. Mr. Skoda attributed these discrepancies to the large volume of workmen's compensation prescriptions filled by Cedar Hill, wherein the nominal amounts billed for such prescriptions were greater than the actual amounts reimbursed to Cedar Hill for such prescriptions. Mr. and Mrs. Parsons did not mention to Mr. Skoda that they had withdrawn for personal use some of the amounts listed as deposits on the pink sheets, and Mr. Skoda did not review the Parsonses' personal bank accounts during the years at issue.

At various times, Mr. Parsons advanced funds to Cedar Hill, and as of January 31, 1987, Cedar Hill's books recorded debt owed to Mr. Parsons of $54,891.68. In February 1987, in an effort to avoid Mr. Parsons' having imputed interest income from Cedar Hill, SMR recharacterized on Cedar Hill's books $52,000 of the indebtedness to Mr. Parsons as Mr. Parsons' paid-in capital. As a result of SMR's action, by February 28, 1987, Cedar Hill's indebtedness to Mr. Parsons was recorded as only $3,066.68, and by April 30, 1987, the indebtedness had been eliminated from Cedar Hill's books.

In April or May of 1989, Donald Paskert, a revenue agent for respondent, began a Taxpayer Compliance Measurement Program audit of Cedar Hill. At that time, Mr. Paskert asked for and received all of Cedar Hill's books and records. During his audit of Cedar Hill, Mr. Paskert was unable to reconcile the deposit amounts

listed on the pink sheets with the bank deposits recorded on the bank statements for Cedar Hill's account.  He was also unable to match the figures from Cedar Hill's white sheets with those from the pink sheets.  To resolve these discrepancies, Mr. Paskert expanded his investigation to the personal tax returns of petitioners.  He requested and received petitioners' personal bank records in the fall of 1989, which indicated that petitioners had made deposits that far exceeded the income reported on their returns.  In a subsequent telephone interview with Mr. Paskert, when asked about these excess deposits, Mr. Parsons admitted that all the funds in petitioners' bank account consisted of either Mrs. Parsons' wages or money removed from Cedar Hill.  At a second meeting in December 1989, Mr. Parsons admitted to Mr. Paskert that the pink sheets did not reflect all of the cash withdrawn from Cedar Hill by petitioners.

Mr. and Mrs. Parsons were subsequently indicted and, after a jury trial, convicted of two violations of section 7206(1) with respect to their 1987 and 1988 returns, for subscribing to false income tax returns.  Specifically, the indictments charged petitioners with reporting on each return total income which they knew to be false.

Petitioners reported gross income of $49,660 and $54,379 in 1987 and 1988, respectively, which included salary income of Mr. Parsons from Cedar Hill of $25,000 and $30,000, respectively.

For the same respective years, respondent determined, using the bank deposits and cash expenditures method, that petitioners had unreported income of $57,106 and $35,957.  Petitioners now concede they had unreported income in these amounts, the source of which was cash proceeds from Cedar Hill's operations not deposited into Cedar Hill's bank accounts but instead retained by petitioners.  Thus, petitioners received from Cedar Hill a total of $82,106 and $65,957 during 1987 and 1988, respectively, while reporting as income only $25,000 and $30,000, respectively, from that source.

Respondent determined in addition that the underpayments resulting from the unreported income in each year at issue were due to fraud and that there was a substantial understatement of tax in each year within the meaning of section 6661(a).  Petitioners dispute these determinations.

OPINION

## 1.  Fraud

The existence of fraud is a question of fact.  See Hagaman v. Commissioner, 958 F.2d 684, 696 (6th Cir. 1992), affg. and remanding on other grounds T.C. Memo. 1987-549.  Respondent has the burden of proving fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b).  If respondent establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud,

except to the extent petitioners establish otherwise.  See sec. 6653(b)(2).  To establish fraud, respondent must show that petitioners "engaged in conduct with the intent to evade taxes that * * * [they] knew or believed to be owing."  United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990).  Direct evidence of fraud is seldom available.  See Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  Consequently, we may rely on circumstantial evidence to establish fraud.  See United States v. Walton, supra; see also Hagaman v. Commissioner, supra at 696.  Fraud may be inferred from "any conduct, the likely effect of which would be to mislead or to conceal."  Spies v. United States, 317 U.S. 492, 499 (1943).  The taxpayer's background, including his sophistication, experience and education, and the context of the events in question may be considered circumstantial evidence of fraud.  See Solomon v. Commissioner, 732 F.2d 1459, 1461-1462 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274; Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

The courts have established several indicia or "badges" of fraud which include:  (1) Understating income; (2) maintaining inadequate records; (3) giving implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in

illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash. Spies v. United States, supra at 499; Conti v. Commissioner, 39 F.3d 658, 662 (6th Cir. 1994), affg. and remanding on other grounds T.C. Memo. 1992-616; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia constitutes persuasive circumstantial evidence of fraud. See Bradford v. Commissioner, supra at 307; Petzoldt v. Commissioner, supra at 700. Finally, although not dispositive, a conviction for filing false Federal income tax returns under section 7206(1) is evidence of fraudulent intent. See Wright v. Commissioner, 84 T.C. 636, 643-644 (1985); Miller v. Commissioner, T.C. Memo. 1989-461.

Petitioners concede they had unreported income resulting in the deficiencies as determined by respondent for 1987 and 1988, which establishes an underpayment for each year. However, they contend that the underpayments were not due to fraud. Petitioners mount a number of arguments to show that they lacked the requisite fraudulent intent.

First, to rebut the adverse inferences that might be drawn from the fact that Mr. Parsons often took cash from Cedar Hill's proceeds without recording it on the pink sheets as a personal draw, petitioners contend that they understood the pink sheets to function merely as a "snapshot" of the day's business activity, so that cash removed after the business day need not be reflected on the pink sheets. Thus, the argument goes, Mr. Parsons recorded cash he withdrew for personal use from the registers during business hours but did not believe it was necessary to record cash taken on the following day before Cedar Hill's proceeds were deposited into its bank account. Besides finding it implausible that a college-educated, successful businessman could believe this, we note that petitioners' own actions are inconsistent with this explanation. Mrs. Parsons testified that she would on occasion remove cash for petitioners' personal use in the evenings at home when she was performing her bookkeeping tasks for Cedar Hill, and that these withdrawals were recorded as personal draws on the pink sheets. If petitioners believed the pink sheets were to function only as a "snapshot" of the business day, Mrs. Parsons' after-hours withdrawals would not need to be recorded.[4]

_____

[4] Petitioners' "snapshot" theory is also different from the explanation initially provided by petitioners' accountant to respondent's revenue agent in the course of the audit. As
(continued...)

Apparently recognizing that if, as they professed to believe, it was not necessary to record on the pink sheets all withdrawn cash, then there would have to be some means by which SMR could trace withdrawn cash not so recorded, petitioners claim they believed SMR would compile the unrecorded cash by examining the records of Mrs. Parsons' personal checking account, into which petitioners claim all such cash was deposited. Petitioners concede that the records of Mrs. Parsons' account were never given to SMR but claim this failure resulted from a miscommunication between them. Mr. Parsons testified that he instructed his wife to provide her checking account records to their accountant; Mrs. Parsons testified that she misunderstood this instruction. Thus, Mr. Parsons claims, he believed his accountant was taking account of all the cash Mr. Parsons removed from Cedar Hill's proceeds because he could track it through the cash deposits made into Mrs. Parsons' checking account.

Petitioners' efforts to account for the failure to provide Mrs. Parsons' personal checking account records to their accountant--which records, in their version of events, were crucial to the accountant's correctly compiling their income--are

---

[4](...continued)
petitioners' authorized representative, the accountant advised the agent that Mr. Parsons' explanation was that the pink sheets had already been completed and were at home when, on the following morning, he would remove some of the cash awaiting deposit to Cedar Hill's bank account.

based entirely on their self-serving testimony and are unconvincing. Moreover, this failure purportedly caused by miscommunication occurred 2 years in a row. The amounts reported on petitioners' returns as Mr. Parsons' salary or "draw" from Cedar Hill were $25,000 and $30,000 in 1987 and 1988, respectively. Petitioners have conceded that the actual amounts they received from Cedar Hill in those years were $82,106 and $65,957, respectively. We do not believe that petitioners could continue to believe that their accountant was successfully tracking all the cash they were taking from Cedar Hill, via Mrs. Parsons' checking account records, which were never furnished to the accountant, or otherwise, in light of the size of the discrepancies in the figures reported on the return and the amounts actually taken in each year. Finally, respondent has reconstructed personal expenditures in each year (which petitioners have conceded) that substantially exceed the net balance plus deposits into Mrs. Parsons' checking account, creating the clear inference that significant amounts of cash taken from Cedar Hill by Mr. Parsons were not deposited into the account, as petitioners contend, but spent directly on personal expenditures. Accordingly, even if SMR had been provided with Mrs. Parsons' checking account records, it would not have been able to reconstruct all of Mr. Parsons' diversions from Cedar Hill.

Petitioners further contend that they lacked fraudulent intent because they believed any cash they received from Cedar Hill in excess of Mr. Parsons' reported salary constituted repayment of loans owed to Mr. Parsons by the corporation. Although on January 31, 1987, Cedar Hill owed Mr. Parsons $54,892, by February 28, 1987, the value of the loans had been reduced to $3,067. This reduction resulted from SMR's decision to recharacterize amounts recorded as debt as paid-in capital in order to preclude petitioners' having imputed interest income in respect of these amounts. Petitioners assert that they were never informed of the elimination of this indebtedness.

We do not find petitioners' "loan repayment" rationale convincing. Regardless of whether petitioners had been advised of their accountant's recharacterization of the loan amounts as paid-in capital, their rationale that the cash Mr. Parsons took constituted loan repayments fails because there was no way for their accountant to keep track of the purported "repayments" by Cedar Hill. Only if one accepts that Mrs. Parsons' checking account was intended to provide a means for SMR to compile Mr. Parsons' removals of cash--which, for the reasons previously stated, we do not--could SMR have any conceivable way of keeping track of Cedar Hill's outstanding indebtedness to Mr. Parsons as he "paid himself back" with diverted cash.

A final argument by petitioners deserves brief consideration. Petitioners contend that if they were attempting to evade taxes, they would not have left such a clear "paper trail". Specifically, petitioners argue that a lack of fraudulent intent should be inferred from the fact that all of the diverted cash was deposited into Mrs. Parsons' checking account, creating a clear record of the diversions which they would have avoided if their intent were to evade. As discussed previously, the record in this case refutes petitioners' claim that all their cash withdrawals from Cedar Hill were deposited into Mrs. Parsons' checking account. A second "paper trail" that petitioners contend they created, which rebuts fraudulent intent, concerns the accurate recording of all of Cedar Hill's cash sales on the pink sheets. According to this argument, it would have been "very simple" for Mr. Parsons to avoid ringing up cash sales on the register or to record a lower figure for cash sales on the pink sheets if he intended to evade taxes. We find this argument unpersuasive. First, the record in this case does not establish that the pink sheets accurately recorded Cedar Hill's transactions in cash. Respondent reconstructed unreported income using the bank deposit and cash expenditures method, not by reference to data on the pink sheets. As to the suggestion that Mr. Parsons could have simply avoided ringing up sales on the register if he wished to divert cash surreptitiously, we note

that Mr. Parsons testified that, as pharmacist, he did not operate the cash register at Cedar Hill; this task was performed by other employees.  Thus, Mr. Parsons could not have readily avoided ringing up cash sales without involving his employees in this scheme.

In summary, we find that in removing cash from Cedar Hill's proceeds and failing to record or report such removal to their accountant, petitioners engaged in "conduct * * * likely * * * to mislead or to conceal."  Spies v. United States, 317 U.S. at 499.  The amounts petitioners diverted to personal use that were not reported on their returns for 2 years in a row were substantial in relation to their reported income, rebutting inferences of mere mistake or inadvertence.  The explanations offered by petitioners to cast these events in a more innocent light are implausible and unpersuasive.  Moreover, petitioners were both convicted of violations of section 7206(1) for filing returns for each year in issue reporting an amount of income which they knew to be false.  While the convictions under section 7206(1) do not estop petitioners from denying fraud for these years, they are evidence of fraud.  Absent some credible evidence that knowingly filing a false return should not be considered indicative of fraud, a section 7206(1) conviction is highly persuasive of fraud.  See Biaggi v. Commissioner, T.C. Memo. 2000-48; Wilson v.

Commissioner, T.C. Memo. 1994-454; Avery v. Commissioner, T.C. Memo. 1993-344; Williamson v. Commissioner, T.C. Memo. 1993-246.

On the basis of the foregoing, we hold that respondent has shown by clear and convincing evidence that the underpayments in 1987 and 1988 are due to fraud on the part of both petitioners. Under section 6653(b)(3), the fraud of one joint-filing spouse cannot be attributed to the other; respondent must show that each spouse engaged in fraud. Although on the basis of petitioners' testimony it appears that all or most of the cash diversions from Cedar Hill may have been the result of Mr. Parsons' taking cash without recording it as a personal draw, Mrs. Parsons' involvement in and awareness of the diversions is clear. According to petitioners' testimony, the cash withdrawals that were not recorded on the pink sheets typically occurred when Mrs. Parsons would call Mr. Parsons at work to request that he make a deposit into her account to cover checks she was writing. Mrs. Parsons' testimony that she had "no idea" where Mr. Parsons got the money to make these deposits is, in the circumstances, not credible. Because she performed daily bookkeeping duties for Cedar Hill, Mrs. Parsons had knowledge of the business' finances and the extent of petitioners' use of Cedar Hill proceeds.

## 2.  Substantial Understatements

Section 6661 provides for a 25-percent addition to tax on any substantial understatement.  A substantial understatement is one that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  See sec. 6661(b)(1).  The amount of the understatement, for purposes of section 6661, is to be reduced by the portion attributable to any item for which there was substantial authority or any item that was adequately disclosed.  See sec. 6661(b)(2)(B).  In addition, the Commissioner may waive all or part of a section 6661 addition to tax upon a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith.  See sec. 6661(c).

Petitioners have not claimed substantial authority or adequate disclosure.  Rather, petitioners argue they had reasonable cause and acted in good faith and that respondent abused his discretion in denying them relief.  To show reasonable cause and good faith, petitioners rely upon the same arguments and explanations they employed in an effort to show that they lacked fraudulent intent.  These arguments are no more persuasive here, nor do we see how petitioners can reconcile their convictions under section 7206(1) with a showing of reasonable cause or good faith.  For the foregoing reasons we do not find that respondent acted "arbitrarily, capriciously, or without

sound basis in fact" in not waiving the additions to tax in this case.  <u>Mailman v. Commissioner</u>, 91 T.C. 1079, 1084 (1988); see also <u>Rao v. Commissioner</u>, T.C. Memo. 1996-500.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.