T.C. Summary Opinion 2003-127

UNITED STATES TAX COURT

DARRELL L. GAINES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8751-01S.                    Filed September 11, 2003.

<u>Vic Devlaeminck</u>, for petitioner.

<u>Nhi T. Luu-Sanders</u>, for respondent.

CARLUZZO, <u>Special Trial Judge</u>:  This case was heard pursuant
to the provisions of section 7463 of the Internal Revenue Code
in effect at the time the petition was filed.  Unless otherwise
indicated, subsequent section references are to the Internal
Revenue Code in effect for the years in issue.  Rule references
are to the Tax Court Rules of Practice and Procedure.  The

decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

In a notice of deficiency mailed on April 13, 2001, respondent determined deficiencies in petitioner's Federal income taxes and imposed penalties as follows:

| Year | Deficiency | Sec. 6662 Penalty | Sec. 6663 Penalty |
|------|-----------|-------------------|-------------------|
| 1993 | $9,177 | --- | $6,882.75 |
| 1994 | 5,701 | $1,140.20 | 4,275.75 |
| 1995 | 4,172 | 834.40 | 3,129.00 |

Different amounts are asserted in respondent's amended answer. After discovery of unspecified errors in the calculations of those amounts, the parties agree that, as properly computed, the deficiencies and penalties here in dispute are as follows:

| Year | Deficiency | Sec. 6662 Penalty | Sec. 6663 Penalty |
|------|-----------|-------------------|-------------------|
| 1993 | $6,952 | --- | $5,214.00 |
| 1994 | 6,147 | $1,282.00 | 4,808.00 |
| 1995 | 6,824 | 2,103.00 | 7,887.00 |

The issues for decision are: (1) Whether petitioner underreported his income during each year in issue; and, if so, (2) whether the underpayment of tax required to be shown on petitioner's return for each year is due to fraud or, for 1994 and 1995, as an alternative to fraud, whether the underpayment of tax required to be shown on petitioner's return is due to negligence.

Background

Some of the facts have been stipulated and are so found.  At the time the petition was filed, petitioner resided in Vancouver, Washington.

Petitioner began working as a paper boy at the age of nine. Upon graduation from high school, he enlisted in the United States Marine Corps.  After being discharged from the Marines he worked for a variety of companies and eventually became self-employed.  His earnings from these various occupations as reported to the Social Security Administration are listed below:

| Year | Employer | Wages |
|------|----------|-------|
| 1962 | Seaside Assembly of God | $183.48 |
| | U.S. Marine Corps | 93.60 |
| | Nicolai Co. | 66.72 |
| 1963 | U.S. Marine Corps | 789.19 |
| 1964 | U.S. Marine Corps | 1,106.48 |
| 1965 | U.S. Marine Corps | 1,469.10 |
| 1966 | U.S. Marine Corps | 716.60 |
| | Intl. Paper Co. | 12.00 |
| | Boise Cascade Corp. | 302.92 |
| | Nu-Lam Wood Products, Inc. | 5.00 |
| | Van-Port Panel Co. | 81.60 |
| 1967 | John A. Sundwall | 40.50 |
| | Pacific Wood Treating Corp. | 59.00 |
| | Brand-S Corp. | 6.80 |
| 1968 | Fort Vancouver Plywood Co. | 71.55 |
| | Kilpatrick, Inc. | 419.13 |
| | Young Gabco, Inc. | 73.78 |
| | Pacific Maritime Assoc. | 807.42 |
| | Brimer Construction Co. | 199.50 |
| 1969 | Brimer Construction Co. | 83.00 |
| | John Barchek | 25.20 |
| | Portco Corp. | 49.55 |
| | Vanply, Inc. | 8.46 |
| | Precision Wood Products, Inc. | 80.75 |
| | Wheels of Man, Inc. | 527.43 |
| | Metal Tech Corp. | 84.80 |

| | | |
|---|---|---|
| | Swan Mfg. Co. | 44.10 |
| | George Zent & Sons | 23.60 |
| | Del Monte Corp. | 385.28 |
| | James River Corp. of Nevada | 26.08 |
| | Jarman Co. Corp. | 258.19 |
| | Floating Marine Ways, Inc. | 133.40 |
| 1970 | Fort Vancouver Plywood Co. | 216.64 |
| | Timber Inspection Bureau, Inc. | 22.50 |
| | Pacific Southern Foundries | 26.92 |
| | Western Wirebound Box Co. Corp. | 59.48 |
| | Alpine Veneers, Inc. | 162.68 |
| 1971 | Fort Vancouver Plywood Co. | 7,800.00 |
| 1972 | Fort Vancouver Plywood Co. | 9,000.00 |
| 1973 | Fort Vancouver Plywood Co. | 10,800.00 |
| 1974 | Fort Vancouver Plywood Co. | 13,200.00 |
| 1975 | Fort Vancouver Plywood Co. | 14,100.00 |
| 1976 | Fort Vancouver Plywood Co. | 15,300.00 |
| 1977 | Fort Vancouver Plywood Co. | 16,500.00 |
| 1978 | Fort Vancouver Plywood Co. | 17,700.00 |
| 1979 | Fort Vancouver Plywood Co. | 6,389.38 |
| 1980 | --- | --- |
| 1981 | Stevenson Co Ply, Inc. | 13,691.34 |
| 1982 | Stevenson Co Ply, Inc. | 4,916.25 |
| 1983 | --- | --- |
| 1984 | CA Miami Elevator Co. | 3,773.06 |
| 1985 | Kelly Services, Inc. | 28.00 |
| | High Cascade Lumber Corp. | 158.34 |
| 1986 | --- | --- |
| 1987 | Vanalco, Inc. | 340.00 |
| 1988 | Timberline Forest Products | 678.00 |
| 1989 | Lamplighter Homes, Inc. | 2,479.96 |
| 1990 | Lamplighter Homes, Inc. | 1,154.68 |
| | Loren Enterprises | 1,165.42 |
| | D & R Remodeling-Decorating | 426.79 |
| | All States Plastic Co., Inc. | 681.00 |
| | K-M Services, Inc. | 112.75 |
| | Multnomah Plywood Corp. | 890.76 |
| 1991 | Fort Vancouver Plywood Co. | 1,350.00 |
| 1992 | --- | --- |
| 1993 | Self-employed, Grand Video | 2,369.00 |
| 1994 | Self-employed, Grand Video | 1,833.00 |
| 1995 | Self-employed, Grand Video | 3,924.00 |

Total: $159,484.16

Petitioner purchased a house in 1972. On January 22, 1982, he mortgaged the house to secure a loan of approximately $22,400. The above table suggests that petitioner was not employed for the entire year in 1982 and was not employed at all during 1983. Soon after obtaining the loan, petitioner stopped making the required monthly payments. On March 18, 1984, with a loan repayment arrearage of approximately $4,000, petitioner's house was sold in a foreclosure sale. Petitioner lived with a friend for several months thereafter, but soon moved in with his parents at their house. In 1993, while petitioner was living with his parents, they deeded their house and a rental property that they owned to petitioner. Later in 1993, petitioner's father was denied State-assisted medical benefits because, according to State authorities, he transferred assets without adequate consideration.

Petitioner and another individual formed a partnership in 1979 for the purpose of constructing several houses on land owned by petitioner. Petitioner obtained financing for the construction projects from a local bank. The truck that petitioner had purchased for use in the partnership's business was repossessed. On his 1979 and 1980 Federal income tax returns, petitioner reported adjusted gross incomes of $3,758 and ($45,697), respectively.

On March 16, 1991, petitioner traded an unimproved 5-acre parcel of land that he owned for Grand Video, a video rental business with a store located in Vancouver, Washington. The selling price for the business, which did not include the land or building in which the store was located, was $30,000. On his 1991 Federal income tax return, petitioner reported a $53,000 basis in the land and claimed a long-term capital loss of $23,000 as a result of the acquisition of Grand Video. Petitioner owned and operated Grand Video as a sole proprietorship from the date he acquired it throughout the years in issue.

Grand Video's store was typically open from 10:30 in the morning until midnight, 7 days a week. Initially, petitioner was the only person who worked in the store. He eventually hired employees to assist him. At first, petitioner paid his employees "under the table"; that is, in cash, without withholding for Federal and State income and employment taxes. He failed to file the requisite Federal and State employment tax forms until examined by State employment tax authorities. As a result of the State audit, petitioner was determined to be an unregistered employer from June 1993 through July 1995. He was fined $500, plus penalties and interest.

Petitioner used unnumbered, duplicate receipts to track video rentals at Grand Video. When a video was rented,

petitioner filled out a receipt, gave one copy to the customer, and placed the other copy in a drawer.  When the video was returned, petitioner matched it to the receipt and wrote the letter "R" on the receipt to indicate that the video had been returned.  These receipts were examined each month by Washington State officials to determine petitioner's Washington State excise tax liability, which apparently was based in some part on gross receipts.

During the years in issue, Grand Video's video rental prices ranged from $1 to $3.50 per day.  Many customers paid by check, but most transactions were in cash; credit cards were not accepted.  The cash register in Grand Video's store was used to hold cash and make change, but not to record income from rental and sales transactions.

Petitioner maintained several bank accounts during the years in issue.  One checking account was dedicated to Grand Video (the business account).  Many business expenses, including rent, utilities, and store maintenance were paid by checks drawn on the business account.  Other business expenses were paid by cash and recorded in a cash journal, but income received in cash was not.  Entries in the cash journal, including the cost of the journal itself (i.e., $5.25), range from $.89 for a drill bit to $879.39 for "new carpet".

Typically, petitioner made two or three deposits per week into the business account. Business account deposits made during the years in issue are summarized below:

| Year | Check Deposits | Cash Deposits | Total |
|------|----------------|---------------|-------|
| 1993 | $11,604.36 | $12,175.06 | $23,779.42 |
| 1994 | 19,210.40 | 9,962.16 | 29,172.56 |
| 1995 | 16,771.64 | 12,680.29 | 29,451.93 |
| Total | $47,586.40 | $34,817.51 | $82,403.91 |

Deposits into petitioner's other bank accounts are summarized as follows:

| Year | Check Deposits | Cash Deposits | Total |
|------|----------------|---------------|-------|
| 1993 | $74.16 | $52,204.35 | $52,278.51 |
| 1994 | 300.00 | 44,401.00 | 44,401.00 |
| 1995 | --- | 39,004.00 | 39,004.00 |
| Total | $374.16 | $135,609.35 | $135,683.51 |

Before the years in issue, petitioner's investments were generally limited to real estate. During this time, he purchased, rented, and sold several houses. In 1993, petitioner began investing in securities. In January 1993, petitioner purchased three U.S. Savings Bonds, each with a face value of $10,000. Between July 1993 and October 1995, petitioner invested approximately $158,000 in various mutual funds. Thereafter, it appears that petitioner's interest in investing in securities faded rapidly. On December 5, 1995, petitioner redeemed mutual fund shares with a net asset value of $119,187.30. On December 20, 1995, petitioner purchased real property for approximately $83,000.

Petitioner timely filed his Federal income tax returns for each year in issue. He reported adjusted gross income of ($1,914) in 1993, $1,844 in 1994, and $3,559 in 1995. Petitioner's reported tax liabilities were $362 in 1993, $280 in 1994, and $600 in 1995. Each of the returns petitioner filed during the years in issue, as well as those filed in 1991 and 1992, includes a Schedule C, Profit or Loss From Business, for Grand Video. Income, deductions, and profits or losses reported on the Schedules C are as follows:

|                   | 1991     | 1992     | 1993     | 1994     | 1995     |
|-------------------|----------|----------|----------|----------|----------|
| Gross income      | $19,459  | $27,998  | $47,722  | $47,488  | $43,956  |
| Deductions        | 19,629   | 28,103   | 45,157   | 45,504   | 39,713   |
| Net profit (loss) | (170)    | (105)    | 2,565    | 1,984    | 4,248    |

With the possible exception of 1995, no deductions are claimed for wages paid in cash to petitioner's employees during any of the years listed above.

Each return was prepared by a paid income tax return preparer. With respect to the items listed on the Schedules C, petitioner provided the return preparer with the cash journal and bank records for the business account. For at least 1995, the return preparer relied upon petitioner's statement as to the amount of income he earned through Grand Video.

The examination of petitioner's returns for the years in issue began in 1996.[1]  Petitioner failed to report interest income, rental income, dividend income, and capital gains on his original returns.  On May 7, 1997, petitioner filed Forms 1040X, Amended U.S. Individual Income Tax Return, for 1993, 1994, and 1995.  On the amended returns, petitioner reported additional income as follows:

|                      | 1993    | 1994    | 1995     |
|----------------------|---------|---------|----------|
| Interest income      | $869    | $133    | $449     |
| Sch. E net income    | 199     | 2,137   | 677      |
| Dividend income      | 777     | 2,377   | 2,844    |
| Capital gain         | 1,547   | 1,518   | 22,898   |
| Sch. C net income    | 1,715   | ---     | ---      |
| Total                | $5,107  | $6,165  | $26,868  |

On each amended return, petitioner indicated that he had "inadvertently omitted" these items of income.

On an application to open an investment account in 1993, petitioner indicated that his income for that year was between $30,000 and $49,999.  On an application for a credit card that petitioner applied for in 1995 he indicated that his monthly gross income from Grand Video was $7,000.

Revenue Agent Keinle (Agent Keinle) conducted the examination of petitioner's returns.  During the course of the examination, petitioner provided her with business and personal

---

[1] The provisions of sec. 7491 are not applicable to this proceeding.

expense records, the cash journal, asset records, and personal and business bank records.  Agent Keinle concluded that petitioner's income for each year in issue could not be accurately determined from his records, and she decided to reconstruct petitioner's income for each year using the net worth method.

During her examination, Agent Keinle interviewed petitioner on at least five occasions.  Relying upon information that petitioner provided during these interviews, information contained in his records, and information obtained from third parties, she computed his net worth and unreported income as follows (For convenience, amounts are rounded to the nearest dollar.):

| Year ending | 12/31/92 | 12/31/93 | 12/31/94 | 12/31/95 |
|---|---|---|---|---|
| Total assets | $164,346 | $240,370 | $308,216 | $378,660 |
| Total liabilities | (16,120) | (52,367) | (85,077) | (114,270) |
| Net worth | 148,226 | 188,003 | 223,139 | 264,389 |
| Beginning net worth | --- | (148,226) | (188,003) | (223,139) |
| Net worth increase | --- | 39,777 | 35,136 | 41,251 |
| Adjustments | --- | (21,765) | (12,970) | (6,299) |
| Corrected AGI | --- | 18,011 | 22,166 | 34,951 |
| AGI per original return | --- | (7,964) | (4,408) | (2,841) |
| Unreported income | --- | 25,975 | 26,574 | 37,792 |

The assets included in the above computations are as follows:

| Year ending | 12/31/92 | 12/31/93 | 12/31/94 | 12/31/95 |
|---|---|---|---|---|
| Cash on hand | $200 | $200 | $200 | $200 |
| Cash in banks[2] | 55,201 | 98,859 | 142,041 | 109,560 |
| Personal residence | --- | 459 | 459 | 459 |
| Investment property | --- | --- | --- | 83,189 |
| Rental property | 20,000 | 20,306 | 20,306 | 20,306 |
| Business assets | 87,145 | 107,099 | 132,063 | 151,128 |
| Goodwill | 1,000 | 1,000 | 1,000 | 1,000 |
| Prepaid expenses | --- | --- | --- | 670 |
| Automobiles | 800 | 12,447 | 12,147 | 12,147 |

The increases in petitioner's net worth from year to year are not attributable to gifts, inheritances, or nontaxable sources of income. In one interview, petitioner told Agent Keinle that at the beginning of 1993 he had $60,000 in cash in a safe in his house and approximately $40,000 in cash in that safe at the end of 1995 (petitioner's cash hoard). At a subsequent interview, petitioner estimated that he had $165,000 in cash in his safe, but later suggested that this figure was a lifetime high, rather than the amount in the safe at the start of 1993. Agent Keinle interviewed third parties, reviewed petitioner's financial records, and examined petitioner's tax returns, but she was unable to corroborate petitioner's claim that he had accumulated a cash hoard. She rejected petitioner's claim of the existence of a cash hoard and gave him no credit for such in her net worth analysis.

---

[2] The parties stipulated that "cash in banks" includes petitioner's investment accounts and securities.

Petitioner's returns for the years in issue also gave rise to a criminal tax investigation conducted by Special Agent Dan Wardlaw. Petitioner told Special Agent Wardlaw that he had approximately $140,000 in cash in his safe at the beginning of 1993, but only $5,000 to $10,000 at the end of 1995.

Discussion

A taxpayer has a duty to maintain adequate records to show whether or not the taxpayer is liable for Federal income tax. Sec. 6001. If a taxpayer fails to maintain or produce such records, the Commissioner may compute a taxpayer's income and income tax liability by a variety of indirect methods, including the net worth method as used by respondent in this case. See, e.g., Holland v. Commissioner, 348 U.S. 121 (1954); Petzoldt v. Commissioner, 92 T.C. 661 (1989).

Petitioner's records for Grand Video consist of the business account and a cash journal. The cash journal does not record income, and by comparing the annual business account deposits to the gross income reported on Grand Video's Schedule C it is clear that not all of the income from Grand Video was deposited into the business account. Furthermore, although there was a cash register in Grand Video's store, it was not used to record rental and sales transactions. Because petitioner's records do not adequately demonstrate the amount of income he earned each year, it was appropriate for respondent to use an indirect method to

reconstruct petitioner's income for those years. See <u>Giddio v. Commissioner</u>, 54 T.C. 1530 (1970).

According to respondent, the increase in petitioner's net worth from year to year is attributable to unreported income received by petitioner during those years. Respondent contends that one likely source of omitted income is Grand Video. Petitioner contends that respondent's net worth analysis is flawed because it fails to take into account petitioner's cash hoard. According to petitioner, respondent's failure to account for his cash hoard results in an overstatement of the increase in his net worth for each year in issue, which in turn results in an overstatement of his income for those years. Otherwise, petitioner agrees with the items included in respondent's net worth analysis for each year.

At trial, petitioner estimated that as of the beginning of 1993 he had approximately $150,000 in cash in his safe at home. He claims that he saved between 80 and 90 percent of his earnings over the years and that those savings were reduced to cash and placed into his safe. He further claims that he profited from various real estate transactions and other investments over the years, and that those profits were likewise converted to cash and placed into his safe. This claim, however, is contradicted by other evidence in the record. For example, petitioner claims that the partnership he established in 1979 was profitable, but

his Social Security records, his Federal income tax returns for 1979 and 1980, and his former partner, who testified at trial, indicate otherwise.

A claim of the existence of a cash hoard is often "met with some suspicion", De Venney v. Commissioner, 85 T.C. 927, 933 (1985), and we are more than somewhat suspicious of petitioner's claim in this case. Ignoring for the moment petitioner's inconsistent statements as to the amount of his cash hoard, after careful consideration of other evidence in the record we, like respondent, reject his claim.

His earning history over the years, as indicated by Social Security and income tax records, does not support the accumulation of cash in any amount claimed by petitioner. See Petzoldt v. Commissioner, supra at 692. According to petitioner, he led a frugal lifestyle for most of his adult life and was able to accumulate cash savings to the extent claimed. Although they do not provide a complete picture of his earnings, petitioner's Social Security records, when coupled with information in the record regarding his Federal income tax returns filed in years as far back as 1967, make petitioner's claim that his frugal lifestyle allowed him to accumulate a substantial cash hoard completely incredible. Moreover, if petitioner had access to the amount of cash he claimed, we think it highly unlikely that he would have allowed his house to be sold in a foreclosure sale in

1984, or allowed his truck to be repossessed in 1990. It is equally unlikely that petitioner, who behaved parsimoniously[3] with respect to Grand Video, would be willing, as he claimed at trial, to forgo the interest that he would have earned on his cash accumulation if that cash were deposited into an interest-bearing account, especially in those years where his Social Security and income records indicate that he had little, if any, income.

The pattern in which cash deposits were made to petitioner's bank accounts also undermines petitioner's claim to a substantial cash hoard. According to petitioner, he removed cash from his safe from time to time and deposited the cash into his personal bank accounts. His explanation is in sharp contrast to the pattern of cash deposits revealed by his bank records. Those records indicate that petitioner made frequent cash deposits into his personal accounts at regular intervals during the years in issue.

The foregoing reasons to reject petitioner's claim that he had a substantial amount of cash in his safe at the beginning of 1993 are made more compelling after considering that, at the beginning of 1993, he had in excess of $55,000 on deposit in

---

[3] Petitioner recorded in the cash journal many items costing less than $1 and testified that even if a Grand Video receipt had been erroneously completed he would not discard it because each receipt cost approximately $.20.

banks. Accepting petitioner's claim would require a finding that, at the beginning of 1993, petitioner had cash savings that substantially exceeded the total amount of his earnings during the prior 30 years. To the extent that petitioner was able to accumulate cash savings over the years, we are satisfied that the $55,201 credit for "cash in banks" that petitioner was given in respondent's net worth analysis adequately accounts for those savings.

We reject petitioner's claim that respondent's net worth analysis is flawed. We find no error in respondent's failure to take into account any cash accumulation not already accounted for in the net worth analysis. Petitioner does not claim that the analysis is incorrect in any other way. Furthermore, statements made by petitioner in investment account and credit card applications support respondent's computations of petitioner's income for at least two of the years in issue. Consequently, respondent's determination of the deficiency, as stipulated,[4] for each year in issue is sustained.

Respondent determined that the underpayment of tax required to be shown on petitioner's return for each year is issue is due to fraud. Section 6663(a) imposes a 75-percent penalty on the portion of any underpayment of tax that is attributable to fraud.

_____

[4] The stipulation effectively satisfies the provisions of sec. 6214(a) with respect to respondent's claims for increased deficiencies for 1994 and 1995.

The Commissioner bears the burden of proof with respect to the imposition of the fraud penalty for each year. Sec. 7454(a); Rule 142(b). The Commissioner must establish by clear and convincing evidence: (1) There is an underpayment of tax; and (2) some part of the underpayment of tax is due to fraud. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Powell v. Granquist, 252 F.2d 56, 60-61 (9th Cir. 1958); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). If the Commissioner establishes that any portion of an underpayment is attributable to fraud, then the entire underpayment is treated as being attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes by a preponderance of evidence is not attributable to fraud. Sec. 6663(b).

To prove the existence of an underpayment, the Commissioner may not rely on a taxpayer's failure to carry his or her burden of proof with respect to the underlying deficiency. Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). However, the Commissioner need not prove the precise amount of the underpayment, but only that an underpayment exists. Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); Petzoldt v. Commissioner, 92 T.C. 661, 699-700 (1989).

The amended return filed for each year in issue in this case demonstrates that petitioner underpaid his tax on the original

return filed for each of those years.  In addition to the amended returns, an underpayment of tax for each year is further demonstrated by respondent's net worth analysis, the validity of which is supported by evidence in the record that establishes both the existence of a likely source of unreported income (i.e., Grand Video), and the implausibility of petitioner's claim to the existence of a cash hoard not taken into account in the net worth analysis.  See Parks v. Commissioner, supra at 661.  Respondent has met his burden of establishing an underpayment of tax for each year in issue by clear and convincing evidence.

Respondent must also establish that a portion of the underpayment of tax for each year is due to fraud.  Fraud will be found if, at the time petitioner filed his return for each year in issue, he "intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes."  Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

Because fraudulent intent is seldom established by direct evidence, it may be reasonably inferred from circumstantial evidence, including evidence of a taxpayer's course of conduct. See United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990); Rowlee v. Commissioner, supra; Stone v. Commissioner, 56 T.C. 213, 224 (1971).  Conduct that may indicate fraudulent intent, commonly referred to as "badges of fraud", includes, but is not

limited to: (1) Repeated understatements of income over a period of years, (2) inadequate books and records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) dealing in cash, and (6) engaging in illegal activities. See Bradford v. Commissioner, supra; Niedringhaus v. Commissioner, supra at 211. In one manner or another, petitioner's course of conduct throughout the years in issue is described by these badges of fraud.

Petitioner consistently understated his income for the 3 years before us in this case. In 1993, the income he reported on his Federal income tax return is substantially less than the income he listed on an application to open an investment account. Similarly, the gross income that petitioner reported on the Schedule C included with his 1995 return is substantially less than the business income he listed on a credit card application.

Petitioner's principal source of income during the years in issue was his sole proprietorship, Grand Video. Most of Grand Video's rentals and sales were cash transactions. The store had a cash register, but it was not used to record rental and sales income. Petitioner did not deposit all of the income from Grand Video into the business account, and his cash journal does not record cash income. Petitioner could have tracked Grand Video's cash income through the use of the cash register, the business account, or his cash log, but he elected not to do so. The

business records that petitioner maintained for Grand Video are hardly adequate to establish the amount of Grand Video's gross income for any of the years in issue. Petitioner's failure to keep adequate books and records of his predominately cash business provides strong support for the imposition of the fraud penalties in this case.

Additional support for the imposition of the fraud penalties is found in the inconsistent and implausible claims that petitioner made as to the existence of a substantial accumulation of cash in his safe. Petitioner made no less than three different estimates of the amount of cash he had accumulated in his safe at the beginning of 1993 and the amount that remained at the close of 1995. We note that his initial claim, i.e., $60,000 at the beginning of 1993 and $40,000 at the close of 1995, even if true, would have had only a slight effect on respondent's net worth computations when spread over the 3-year period. Our view of petitioner's cash hoard claim has been set forth above, and there is no point in repeating it here. Suffice it to say that petitioner's inconsistent and implausible claims that he possessed a substantial cash hoard strongly support the imposition of the fraud penalties in this case.

Lastly, we cannot ignore petitioner's practice of paying his employees "under the table" until he was examined and fined by Washington State authorities in 1995. His conduct in this regard

suggests that he had little respect for Federal and State tax requirements.  Furthermore, petitioner concealed these cash payments not only by his failure to file the requisite Federal and State employment tax returns, but by not claiming such payments as deductible expenses on Grand Video's Schedules C. Petitioner's willingness to give up what would otherwise be allowable deductions strongly suggests the existence of unreported cash income.

After careful consideration, we find that respondent has satisfied his burden of showing that the underpayment of tax required to be shown on petitioner's return for each year in issue is due to fraud.

Reviewed and adopted as the report of the Small Tax Division.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.