**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0434n.06

**Case No. 08-1831**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Jul 15, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| SCARFF BROTHERS, INC., a Maryland Corporation, | ) ) ) | |
| Plaintiff- Counter Defendant Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| BISCHER FARMS, INC., a Michigan Corporation, | ) ) ) | |
| Defendant- Counter Plaintiff Appellant, | ) ) ) | |
| MELVIN J. BISCHER, an individual, et al., | ) ) | |
| Defendants-Appellants. | ) ) ) | |
| ———————————————————— | ) ) | |

**BEFORE:  BATCHELDER, Chief Judge; SILER and MOORE, Circuit Judges.**

**ALICE M. BATCHELDER, Chief Judge.**  In this contract dispute, Defendants-Appellants

Bischer Farms, Inc., et al. ("Defendants") appeal the district court's award of contractual damages

to Plaintiff-Appellee Scarff Brothers, Inc. ("Scarff Brothers").  For the reasons that follow, we affirm

in part and vacate and remand in part.

**I.**

The facts of this case were ably set out by the district court in its opinion, *Scarff Brothers,*

*Inc. v. Bischer Farms, Inc.*, 546 F. Supp. 2d 473, 477–84 (E.D. Mich. 2008).  Because neither party

contests the district court's findings of fact for the purpose of this appeal, only a short summary of the main elements is included.

### A.     Parties

Scarff Brothers is owned by two brothers, Lance and Howard Scarff, and is in the business of buying and selling cattle at market. Scarff Brothers places its cattle in feedlots across the country where the cattle are fed and cared for until they are ready for slaughter and sale at market. Bischer Farms, Inc. was one such feedlot. Bischer Farms, Inc. is owned by Melvin Bischer, Janet Bischer, Bradley Geiger and Pauline Geiger in equal shares. These individuals also own several other enterprises, including a concrete business, a field tile business, and a trucking company. Duane Geiger managed the feedlot at Bischer Farms, Inc. and worked with Scarff Brothers to issue monthly bills for the cattle's care.

### B.     The Contract

The parties began doing business in August 2002 after orally agreeing to terms, and in 2003 attempted to put the terms of their agreement into writing. Because the parties could not produce an agreed-upon version of the writing at trial, however, the district court found the terms of their contract from their course of dealing. These terms are as follows. Bischer Farms, Inc. agreed to feed and care for Scarff Brothers' cattle at an agreed maximum cost of gain per pound, insurance per head, and veterinary costs. Scarff Brothers tracked its cattle in lots with detailed handling and cost data attached, which Bischer Farms, Inc. used to bill Scarff Brothers for monthly costs by lot, discounted for any dead cattle, based on Duane Geiger's information. "Finished," or marketable, cattle were selected out of particular lots for slaughter and sale. When the last head in a lot was sold

2

Bischer Farms, Inc. issued a "close out" invoice for the lot. This invoice accounted for all the cattle delivered to Bischer Farms, Inc. as either having died or been sold, and charged Scarff Brothers for any remaining costs.

During the course of their business relationship Scarff Brothers delivered sixty lots to Bischer Farms, Inc., the first forty of which were closed out in this manner. There were 7,194 cattle in those forty lots. Twenty-two cattle were reported to have died and 7,172 head were marketed. Lots forty-one to sixty included 2,840 head, with the last shipment to Bischer Farms, Inc. on January 27, 2004.

### C.    Missing Cattle

At some point in late 2003, Defendants discovered that they could not account for all the Scarff Brothers' cattle that had been delivered to their lot. They initially suspected theft and fired Duane Geiger on January 30, 2004. On February 4th or 5th, Defendants informed Scarff Brothers that at least 100 head were missing. On February 11, 2004, Scarff Brothers came to inspect its cattle and Defendants told them that Duane Geiger had stolen the missing heads of cattle. A hand inspection done by both parties revealed 491 head unaccounted for. On February 12, 2004, Defendants reported the theft to the local sheriff. Soon after Scarff Brothers removed its cattle to other feed lots.

### D.    The Proceedings Below

Scarff Brothers sued in federal district court for breach of contract as well as various tort-related claims. Defendants counterclaimed for breach of contract. After years of contentious litigation the case proceeded to a bench trial lasting 24 half-days. After the conclusion of proofs the district court issued its opinion. It held that Bischer Farms, Inc. had breached its contract with Scarff

Brothers; that Bischer Farms Partnership was a successor to Bischer Farms, Inc. and therefore the partnership and each partner were liable for the breach; and that all the related Bischer Farms entities and individuals were liable as alter egos. The district court dismissed Scarff Brothers' other claims as well as Defendants' counterclaim for breach of contract. The court found Defendants liable for $473,433.36 in damages.[1] This timely appeal followed.

## II

Defendants make several arguments on appeal. First, they argue the district court erred by finding liability for breach of contract when Defendants stood in the position of agisters and therefore could only be liable for negligent losses. Next, Defendants contend that the district court erred in finding Bischer Farms Partnership liable as a successor to Bischer Farms, Inc. Finally, they argue that the district court erred in finding the various Bischer entities and individuals liable as alter egos for Bischer Farms, Inc.

### A.     Jurisdiction and Standard of Review

This action was properly brought in the district court under its diversity jurisdiction, 28 U.S.C. § 1332. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 following a final judgment by the district court. When sitting in diversity, a federal district court applies the substantive law of the state in which it sits and federal procedural law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). On direct appeal after a bench trial we review the findings of fact for clear error and conclusions of law de novo. *Dillon v. Cobra Power Corp.*, 560 F.3d 591, 599 (6th Cir. 2009).

---

[1] The district court originally found Defendants liable for $610,530.27 but reduced the award in an order amending the judgment to account for the cost of caring for the cattle until their final removal from the feedlot.

4

### B.    Breach of Contract

The district court found that Bischer Farms, Inc. breached its contract with Scarff Brothers. Bischer Farms, Inc. took contractual responsibility for the cattle delivered to them to feed, maintain, and finish the cattle to market. Scarff Brothers delivered 491 head of cattle to Bischer Farms, Inc. that subsequently went missing. Defendants attempted to explain the cattle's disappearance by offering cattle ear-tags disinterred from a composter to prove, contrary to their own limited records, that some or all of the cattle had actually died on the feedlot. The district court found Defendants incredible and flatly rejected this theory. It found that the unaccounted-for disappearance of cattle constituted a breach of contract. The court also ruled in the alternative that, even if it had accepted Defendants' extremely unlikely version of events, Bischer Farms, Inc. would have breached the contract by misrepresenting feed charges on at least 189 cattle.

Defendants argue on appeal that they cannot be held liable for the missing cattle because the duty of care required of them was governed by agistment law, not the contract.[2] An agistment is "a contract whereby a person, called an agister, has control of animals and retains possession of land. . . . [It] is a species of bailment." *In re Zwagerman*, 115 B.R. 540, 547 (Bankr. W.D. Mich. 1990) (internal quotations and citations omitted). Defendants claim that, for an agister, "[t]here is no liability without fault, contrary to the district court's reasoning, even though the nature and scope of the obligations owed by the parties to each other are defined by contract." The argument proceeds from the assumption that the contract does not govern the duty of care owed by the Defendants to Scarff Brothers and, therefore, a common law solution must be found. Accordingly, Defendants

---

[2]While it is likely that Defendants did not raise this issue before the district court below, for the purposes of this appeal this Court will assume without deciding that they did.

insist that they cannot be held liable for the "lost" cattle unless they are found to have been at fault in the cattle's disappearance. Because the district court did not determine what happened to the cattle, Defendants claim that no finding of fault was made, and urge this Court to reverse or at least remand the district court's finding of breach.

Defendants' efforts, however, are unavailing. In *Johnston v. Miller*, 40 N.W.2d 770 (Mich. 1950), the Supreme Court of Michigan rejected a similar argument in a suit between the owner of a flock of sheep and the agister the owner paid to feed, house, and multiply the flock. The parties had entered into two complementary contracts using the language of a bailment, but requiring the agister to provide the owner with twice the number of sheep at the end of the contract. *Id.* at 770–71. In the end, the sheep did not reproduce as the agister had hoped, there were insufficient livestock to meet the obligations of the two contracts, and the agister refused to supply extra sheep to make up the difference. *Id.* No claim was made that the agister acted negligently in caring for the sheep. *Id.* at 770. The agister argued that he was a bailee of the sheep and therefore, in the absence of negligence, had only to return the sheep that remained from the original flock. *Id.* at 773. The trial court agreed, but the Supreme Court of Michigan reversed, citing 6 Am. Jur. 310 for the proposition that:

> The fact that a bailee has exercised the degree of care imposed on him by law is immaterial where the issue concerns some additional obligation to which he has subjected himself by his contract, for no degree of care or vigilance, short of complete performance, will relieve him of such an obligation.

*Id.* at 774. The court held that the agister was free to assume any obligations not forbidden by law, and "[u]nder the contract [the agister] assumed a specific obligation from which he could not be discharged except by performance." *Id. See also Universal Underwriters Ins. Co. v. Kneeland*, 599

N.W.2d 519, 526 (Mich. Ct. App. 1999) ("We further observe that in a bailment situation, *in the absence of a contractual duty to the contrary*, a bailee is not an insurer of the property." (emphasis added)).

Applying this principle to the case at hand, we conclude that any hypothetical agister status would not relieve Bischer Farms, Inc. of its contractual obligations to Scarff Brothers. Bischer Farms, Inc. and Scarff Brothers made a contract defined by their course of dealing under which Bischer Farms, Inc. freely assumed the obligation to "feed, maintain, and finish to market Scarff Brothers' cattle." *Scarff Bros.*, 546 F. Supp. 2d at 487. The duty of care assigned by the common law of agistment is "immaterial" where the contract sets out the obligations of the parties. The district court found that Bischer Farms, Inc. breached its duty when 491 head of cattle "disappeared while in the Bischers' care." *Id.* Any existing evidence to establish what happened to the cattle would be almost entirely — if not entirely — within Defendants' control. If Defendants had produced reliable evidence that some or all of those 491 cattle had, in fact, died, then an analysis of the contract's division of death-loss liability would be required. Here, however, Defendants' attempted proof was an ever-evolving set of explanations that the district court wholly rejected, and that rejection was not clearly erroneous. By failing to account for 491 head of cattle, Bischer Farms, Inc. breached the contract. We therefore affirm the district court's findings of a breach of contract and the damages award against Bischer Farms, Inc.[3]

## C.    Successor Liability

---

[3]We note that, contrary to the view expressed in the dissent, the fact that Scarff Brothers was unable to prove that Defendants ultimately benefitted from the cattle is immaterial to this question, because that was an element specific to the statutory conversion claim. Just because Scarff Brothers could not prove that Defendants did not sell or keep the cattle for themselves does not change the fact that Bischer Farms, Inc. had the duty to care for the cattle, "lost" them, and did not provide any credible evidence as to what happened to them.

"The traditional rule of successor liability examines the nature of the transaction between predecessor and successor corporations." *Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 509 (Mich. 1999) (discussing general principles before addressing a products liability situation). Ordinarily, the succession is accomplished in one of two ways: merger or asset transfer. If the successor entity merges with the predecessor by acquiring its stock, the successor generally assumes the predecessor's liabilities. If, however, the predecessor "sells its assets to [the successor], the purchaser is not responsible for the debts and liabilities of the selling corporation." *Antiphon, Inc. v. LEP Transport, Inc.*, 454 N.W.2d 222, 224 (Mich. Ct. App. 1990). In a contract situation, successor liability can be found after an asset transfer, however, if one of four exceptions exists:

> (1) when two or more corporations consolidate and form a new corporation, making no provision for the payment of the obligations of the old; (2) when by agreement, express or implied, a purchasing corporation promises to pay the debts of the selling corporation; (3) when the new corporation is a mere continuance of the old; (4) when the sale is fraudulent, and the property of the old corporation, liable for its debts, can be followed into the hands of the purchaser.

*Id.* at 224–25.

This case, however, does not fit neatly into either the merger or asset transfer rubric, partly because of Defendants' refusal to cooperate in discovery.[4] This is an unusual circumstance in which the predecessor, Bischer Farms, Inc., stopped doing business and was replaced by a new entity,

---

[4]We note the district court's repeated difficulties with Defendants' "nonresponsive and selective discovery" which "required the parties to develop their case as new data materialized." *Scarff Bros.*, 546 F. Supp. 2d at 476. This continued into trial, as Defendants sought to introduce newly discovered evidence four years into litigation and after weeks of trial. The combination of this discovery practice and Defendants' highly evasive witnesses made Scarff Brothers' task of establishing proofs, particularly on potential asset transfers, very difficult. We further note that the district court, on remand, may determine that this objectionable conduct warrants a ruling that Defendants withheld evidence from the court, in which event, the district court could go on to consider whether any negative inferences arise from Defendants' failure to produce evidence on this issue. *See, e.g.*, Fed. R. Civ. P. 37(b); *John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008) ("The district court maintains authority to impose sanctions for discovery violations under the federal rules and pursuant to its inherent powers.").

Bischer Farms Partnership, with the same underlying owners, decision makers, employees, and business pursuits, but the two entities did not execute a merger or an "official" transfer of assets. Rather, the defendants merely effectuated a change in structure in order to take advantage of federal agricultural benefits available to partnerships. Bischer Farms, Inc. only exists pending the outcome of this litigation, and Bischer Farms Partnership has continued to do all the business the corporation used to do. Using the term loosely, the Bischers and Geigers undeniably intended that Bischer Farms Partnership would be the "successor" to Bischer Farms, Inc.

In *Antiphon*, the plaintiff, an importer and producer of sound-deadening materials, appealed a judgment of no cause of action for the defendant, a customs broker. 454 N.W.2d at 223. The defendant had claimed that the plaintiff owed shipping charges to the defendant for shipments made to Seamco, Inc., a corporation from which the plaintiff had purchased a manufacturing plant following a complex series of subsidiary spin-offs and mergers. *Id.* Plaintiff paid the money under protest, then filed suit to recover it. On appeal, the Michigan Court of Appeals noted how rarely these cases arise in Michigan, and analyzed the case under the general rule and the exceptions noted above. *Id.* at 224–25. The court affirmed the trial court's holding of liability under the second exception. The court relied on evidence that the plaintiff paid the defendant for several invoices addressed to the subsidiary corporations involved in the sale, the defendant "dealt with the same personnel, the orders were placed in the same manner, the business operations were conducted in the same manner, and neither Seamco nor any of its subsequent incarnations ever informed [the defendant] of the change in ownership of the . . . plant." *Id.* at 226. As the court framed the issue, "Seamco and [the plaintiff] engaged in activities that could reasonably lead [the defendant] to believe

9

that the two companies were either related or that [the plaintiff] had assumed responsibility for the liabilities incurred by Seamco." *Id.* at 224.

Relying on *Antiphon*, the district court here found Bischer Farms Partnership a successor to Bischer Farms, Inc., and therefore responsible for Bischer Farms, Inc.'s contract liability. Noting the second and third exceptions to the general rule, the court held that the dealings between the partnership and the corporation were sufficiently close that Scarff Brothers reasonably could have believed that the partnership was a successor to the corporation. As the successor corporation in *Antiphon* had done, the partnership here did the same business as the corporation, and had the same employees, address, phone numbers, and decision makers. The court also found evidence that the partnership assumed obligations for the corporation, cared for the same cattle (including Scarff Brothers' cattle before they were taken from the farm), may have received money for some of the corporation's cattle, and may have deposited checks written to the corporation in the partnership's account. Furthermore, just as in *Antiphon*, the partnership never informed Scarff Brothers of a change in ownership. Relying on this evidence, the district court found Bischer Farms Partnership liable for the debts and liabilities of Bischer Farms, Inc., and held each of the partners — Melvin J. Bischer, L.L.C., Janet S. Bischer, L.L.C., and Pauline J. Geiger-Bischer, L.L.C. — liable under Michigan partnership law as well.

After careful review, we find we must vacate this portion of the district court's order and remand for further consideration of this issue. While we find no error in the district court's analysis under the two applicable exceptions from *Antiphon*, it is not clear from the district court's opinion whether or not any transfer of assets took place between Bischer Farms, Inc. and Bischer Farms Partnership. The district court found that the partnership *may* have deposited checks written to

Bischer Farms, Inc. and *may* have received money for the corporation's cattle, but did not conclusively hold that any particular assets, be they cash, property, or goodwill, were transferred from the corporation to the partnership. Scarff Brothers' difficulties in obtaining from the Bischer entities the evidence necessary to demonstrate any asset transfer are clear from this record, and we recognize that this evidence is entirely in the hands of the Bischers. But because the *Antiphon* exceptions are exceptions to the general rule governing successor liability where there has been an asset transfer, without such a transfer, the *Antiphon* exceptions have no bearing. The test for successor liability in *Antiphon* requires more than mere possibilities that such a transfer occurred.[5]

### D. Alter Ego Liability

Michigan generally "treats a corporation as an entirely separate entity from its shareholders." *Soloman v. W. Hills Dev. Co.*, 312 N.W.2d 428, 431 (Mich. Ct. App. 1981). Under "notions of equity," however, courts will disregard the corporate form "when it is invoked to subvert the ends of justice." *Id.* "Where a corporation is so organized and so controlled as to make it a mere instrumentality or an agent of another corporation, its separate existence" will be ignored. *Shirley v. Drackett Prods. Co.*, 182 N.W.2d 726, 728 (Mich. Ct. App. 1971). Also, courts may disregard the corporate form when "[t]he community of interest between corporation and shareholders may be so great that, to meet the purposes of justice, they should be considered as one and the same." *Soloman*, 312 N.W.2d at 431. Michigan requires a showing of "fraud, illegality, or injustice," and

---

[5]We do not address the argument in the concurring and dissenting opinion that in order to find successor liability, the district court must also find that Scarff Brothers cannot recover in full from Bischer Farms, Inc. because it is not necessary to deciding the issue before us. We therefore express no opinion on whether or not that statement is correct as a matter of Michigan law.

that injustice "must in some manner relate to a misuse of the corporate form short of fraud or illegality." *Id.* at 432.

In this circuit, we look to a number of factors to determine whether to disregard the corporate form, including: "(1) the absence of normal corporate formalities; (2) commingling of personal and corporate funds; (3) siphoning of corporate funds by a dominant stockholder; and (4) the fact that the corporation is merely a facade for the personal operations of the dominant stockholder." *United States v. Walton*, 909 F.2d 915, 928 (6th Cir. 1990) (internal citations omitted). No single factor is dispositive as "each case is *sui generis* and must be decided in accordance with its own underlying facts." *Id.*

The district court below cited the *Shirley* and *Walton* factors, but did not specify which of the criteria it relied upon in holding the corporation (Janet S. Bischer Farms, Inc., Bischer Tiling, Inc., Bischer Ready-Mix, Inc.), limited liability company (Melvin J. Bischer, LLC, Janet S. Bischer, LLC, Pauline J. Bischer-Geiger, LLC), and individual (Melvin Bischer, Janet Bischer, Bradley Geiger, and Pauline Geiger) defendants liable as alter egos for Bischer Farms, Inc.'s breach of contract. *Scarff Bros.*, 546 F. Supp. 2d at 494, 496. The district court instead relied on the "extensive and ongoing relationship" among the Defendants that demonstrated the "economic reality" that these entities were in fact a "single comprehensive business enterprise." *Id.* at 495–96. The district court noted that the individuals did not differentiate themselves from the business entities in their own minds, used corporate funds to pay personal expenses, made frequent intercompany loans not at arms length, and shared employees, equipment, and cash. *Id.* at 496. Finally, the court held that to find "any single entity, whether drained of resources to sustain another family entity or enriched at the expense of another entity, is solely responsible to Scarff Brothers

12

would not accord" with the economic reality of the enterprise. *Id.* Instead, "the liability of one entity is the liability of all." *Id.*

While the district court's analysis may satisfy the *Shirley* and *Walton* tests, the court did not make a finding of fraud, illegality, or injustice from the use of the corporate form as *Soloman* requires. Michigan requires such a finding to ensure that "an equal injustice or inequity" does not befall individuals who could otherwise be found liable as alter egos without making improper use of the corporate form. *Soloman*, 312 N.W.2d at 432.

### III.

Accordingly, we **affirm** the judgment of the district court as to Bischer Farms, Inc.'s breach of contract. We **vacate** the district court's finding of successor liability and **remand** for further proceedings consistent with this opinion. In doing so we note that the district court is, of course, free on remand to determine whether successor liability exists under either *Antiphon* or an alternate theory, including one based on more general principles of successor liability consistent with Michigan law, affording the respect due to state law by a federal court sitting in diversity. Finally, we **vacate** the finding of alter ego liability, and **remand** to the district court for a determination of whether any or all of the Bischer Farms entities or individuals engaged in such fraud, illegality, or injustice from the use of the corporate form as would support a finding of alter ego liability under Michigan law.

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.**

The majority ably lays out the three questions in this case: (1) whether the district court erred in holding Bischer Farms, Inc. liable to Scarff Brothers, Inc. ("Scarff Bros.") for breach of contract; (2) whether the district court erred in holding Bischer Farms Partnership successively liable to the corporation; and (3) whether the district court erred in holding Bischer Farms, Inc.'s three related businesses, the four LLCs, and the four individual defendants liable as alter egos of the corporation. I agree with the majority that the district court could not apply successor liability without finding that the corporation had transferred assets to the partnership and that it could not pierce the corporate veil without a finding of fraud. Because I believe that the district court's factual findings do not support the precise breach of contract described in the district court's opinion, however, I respectfully dissent. I also write separately with regard to successor liability because I believe that the district court must make an additional finding before holding the partnership liable: it must conclude that the corporation is judgment-proof.

## I. Breach of Contract

Scarff Bros. claims that the disappearance of 491 head of cattle constituted a breach of contract by Bischer Farms, Inc. Resolving this claim involves two questions: what promises with regard to the cattle did Bischer Farms, Inc. make in its contract with Scarff Bros., and what happened to the cattle. Bischer Farms, Inc. argues that it agreed to exercise due care in finishing the cattle to market, that most of the cattle died, and that it cannot be liable for those deaths absent a finding of fault on its part.[6]

---

[6]I disagree with the majority's characterization of Bischer Farms, Inc.'s position as arguing that it "cannot be held liable for the missing cattle because the duty of care required of [it] was governed by agistment law, not the contract." Maj. Op. at 5. Bischer Farms, Inc. acknowledges that "the nature and scope of the obligations owed by

14

The district court found that Bischer Farms, Inc. agreed "to feed, maintain, and finish to market" Scarff Bros.'s cattle and that Bischer Farms, Inc. breached the agreement when 491 cattle disappeared because it failed to provide the contracted service for those 491. *Scarff Bros., Inc. v. Bischer Farms, Inc.*, 546 F. Supp. 2d 473, 487 (E.D. Mich. 2008). The district court did not decide what actually became of the missing cattle—whether they died, were stolen by Duane Geiger, were converted and sold by Bischer Farms, Inc., or simply broke away to freedom on their own—because it did not have to. Its finding as to the terms of the implied contract mooted that question. In holding Bischer Farms, Inc. in breach based on the unaccounted-for disappearance of the cattle and in assessing the entire value of the 491 head as damages, the district court found that Bischer Farms, Inc. had agreed to feed and finish to market the cattle *no matter what*. On this theory, even if some of the cattle died on the feedlot through no fault of Bischer Farms, Inc.—a possibility that, notwithstanding the majority's suggestion to the contrary, the district judge did not rule out[7]—Bischer Farms, Inc. would be liable for their value.

---

the parties to each other are defined by contract," Appellants' Br. at 12, but it contends that the contract incorporated the duty of care generally applicable in contracts for agistment. Bischer Farms, Inc. argues, in effect, that where cattle loss was concerned, it agreed to be liable only to the extent that it was at fault. Of course, as the majority correctly points out, agisters by contract can take on duties greater than those imposed at common law. The dispositive issue in this case, then, is what duty did Bischer Farms, Inc. agree to take on under the implied contract?

[7]Had the district court found that *none* of the missing cattle had died and that they instead had been stolen, Bischer Farms, Inc. would have no argument on appeal. Whether Bischer Farms, Inc. agreed to be liable for any and all deaths or only those that it caused would be immaterial if there were no deaths. But here the district court made no such finding. It is true that the district court rejected Bischer Farms, Inc.'s contention that 345 cattle died and that Scarff Bros. knew of the deaths. *Scarff Bros.*, 546 F. Supp. 2d at 483–84. But the district court also stated that "[w]hether Bischer Farms maintained the 491 head of cattle or otherwise benefitted from them . . . was not demonstrated by Scarff Brothers' proof," indicating that the court believed the cattle had not simply all been converted. *Id.* at 484. Furthermore, the district court wrote that it did not "accept the Bischers' ever-evolving theory that the missing cattle were *necessarily all* in the composter decomposing," *id.* at 487 (emphasis added), suggesting that it believed that *some* of the 491 had died.

The evidence reviewed by the district court, however, does not support such an agreement. In describing the parties' course of dealing, the district court reviewed their practice only as to the maximum cost of gain per pound, insurance, and veterinary care; delivery of the cattle to the lot; selection of which cattle were ready for sale; and arrangement for transportation to the slaughterhouse. *Id.* at 479-81. The district court noted that the parties kept track of dead cattle, but it made no finding of under what circumstances Bischer Farms, Inc. had to compensate Scarff Bros. for those dead cattle. The court observed that Bischer Farms, Inc. "secured" insurance for the cattle, *id.* at 487, but this fact alone does not support a finding of 100% liability for death loss because there is no evidence as to the terms of that insurance.

Four facts suggest that the parties did *not* intend Bischer Farms, Inc. to be fully liable when the loss resulted from death. First, the district court noted that, in the monthly bills issued to Scarff Bros., Bischer Farms, Inc. would reduce the balance by costs not incurred for cattle that had died. *Id.* at 480-81. The district court did not state that Bischer Farms, Inc. would reduce the costs by the actual value of the cattle, such that it was insuring Scarff Bros. for the loss. Second, the district court found that Scarff Bros. collected data about cattle death loss "so that it could seek financial credits *from the seller* of cattle that had died, if warranted." *Id.* at 482 (emphasis added). This statement indicates that Scarff Bros. had not simply shifted 100% of the risk of death loss to Bischer Farms, Inc. and that Scarff Bros. anticipated that it might have received unhealthy cattle in the first place. Third, the parties shared the cost of veterinary care, again indicating that Bischer Farms, Inc. had not assumed complete liability for the well-being of the cattle. Fourth, the district court noted that, in or around March 2003, the parties worked to memorialize their agreement in a written contract. Though they never finalized the document, the parties appeared to agree on a draft provision stating

16

the following under the heading "death loss": "OWNER bears all risk of loss or damage to the cattle except for loss or damage caused by FEEDER'S breach of this agreement, or negligence or other fault of FEEDER. OWNER accepts all economic loss resulting from death of the CATTLE." *Id.* at 486 n.8. The provision also called for Bischer Farms, Inc. to compensate Scarff Bros. for death loss exceeding 3% and up to 5% of the total head. *Id.* The district court described this as an example of the parties' mutual agreement, but it did not clarify whether the provision reflected their prior course of dealing.

Thus, the facts do not support the district court's view that Bischer Farms, Inc. had agreed to compensate Scarff Bros. for any and all cattle not finished to market, including those that died. Exactly what Bischer Farms, Inc. *had* agreed to do with regard to death loss, then, has not been determined.[8]

The defendants ask that we hold as a matter of law that Bischer Farms, Inc. had agreed to be liable only to the extent that it did not exercise due care. Their logic is that the facts show that the parties had entered into a contract for agistment, a type of bailment, and that under state law, an agistment contract imposes on the bailee a duty of reasonable care.[9] For this proposition, they cite

---

[8]The majority writes that "[i]f Defendants had produced reliable evidence that some or all of those 491 cattle had, in fact, died, then an analysis of the contract's division of death-loss liability would be required." Maj. Op. at 7. The majority agrees, then, that Bischer Farms, Inc. did not promise to finish all cattle to market regardless of the circumstances. Because the district court treated Bischer Farms, Inc. as having made precisely this one-sided commitment (and therefore made no finding of what happened to the cattle), we must reverse.

[9]Scarff Bros. contends that by failing to raise the issue at the district court, the defendants waived their argument that bailment law applies because the contract was one of agistment. It is true that the defendants did not frame the case this way below, and defense counsel actually wrote in his final filing before judgment, "[h]ere there is a Contract in place and there is no bailment." Mem. at Conclusion of Trial at 14 (R.E. #157). However, in the same brief, defense counsel described as a "fiction" the claim that "491 head are the absolute and total responsibility of Bischers, regardless of what happened to them." *Id.* at 11-12. Thus, the district court should have been alerted to the need to determine, based on the default rule for agistments and any other evidence, what level of risk Bischer Farms, Inc. agreed to take on.

17

a Tenth Circuit case applying New Mexico law, a Vermont Supreme Court case, and the American Jurisprudence legal encyclopedia. *See Prod. Credit Ass'n of S. N.M. v. Alamo Ranch Co.*, 989 F.2d 413, 419 (10th Cir. 1993) (holding that party that had agreed orally to feed, care for, and attempt to sell 900 head of cattle was an agister and thus had a common-law duty to exercise ordinary care, absent a special agreement); *Butterfly v. Marcell*, 365 A.2d 252, 253 (Vt. 1976) (holding that party to whom pony was entrusted under an oral contract of agistment was not liable for pony's death after pony was struck by an automobile because no facts supported a finding of negligence or want of ordinary care); 4 Am. Jur. 2d Animals § 57 (stating that under a contract of agistment, "[a]n agister is bound to take reasonable or ordinary care of the animals committed to his or her charge, but in the absence of a special contract, he or she is not an insurer of their safety"). This appears to be the default duty that the Michigan Supreme Court would apply, as well. *See Costello v. Ten Eyck*, 49 N.W. 152, 153 (Mich. 1891) (holding that defendant who took horses for pasture, "[h]aving taken the horse into his possession, though under a void contract, . . . yet owed a duty to the plaintiff to exercise some degree of care over it"); 94 A.L.R.2d 319 (citing cases establishing that this is the general rule among the states).

It would be inappropriate, however, for us to determine as a matter of law what the parties agreed to with respect to death loss. That is a factual question that depends on the course of conduct between the parties, an issue for the district court. The case should thus be remanded for the district court to determine the liability rule agreed to by the parties for cattle deaths, how many cattle died, and what part of the death loss Bischer Farms, Inc. must cover based on the agreed-on liability rule.

Finally, I note that Scarff Bros. argues that the facts brought out at trial support three discrete breaches by Bischer Farms, Inc.: "(i) failing to account for 491 head of Scarff Bros.' cattle, (ii)

18

failing to report cattle that allegedly died to Scarff Bros., and (iii) charging Scarff Bros. [for] feeding cattle that were known by Bischer Farms to be missing." Appellee's Br. at 11. I agree that the facts support each of these alleged breaches. But this does not resolve the case because these proffered breaches do not support the damages calculated by the district court. They warrant compensation for such things as the opportunity cost of not replacing the dead cattle with new ones that could have been finished to market and the cost of feed that should not have been charged. Scarff Bros. can recover for the actual value of the cattle only if Bischer Farms, Inc. agreed to bear the loss of that cattle or if the loss was its fault.

For these reasons, I dissent from the majority's affirmance of the district court's breach-of-contract determination.

## II. Successor Liability

The majority remands because "it is not clear from the district court's opinion whether or not any transfer of assets took place between Bischer Farms, Inc. and Bischer Farms Partnership." Maj. Op. at 10. I agree and add that an additional finding is necessary before successor liability will apply: there must be some reason that Scarff Bros. cannot recover in full from Bischer Farms, Inc.

In *Antiphon, Inc. v. LEP Transport, Inc.*, 454 N.W.2d 222 (Mich. Ct. App. 1990), the court addressed "whether the doctrine of estoppel may be harmonized with any of the exceptions to the general rule against successor liability." *Id.* at 225. One of those exceptions is "when by agreement, express or implied, a purchasing corporation promises to pay the debts of the selling corporation"; another is "when the new corporation is a mere continuance of the old." *Id.* at 224–25. The elements of estoppel, meanwhile are: "(1) a party by representations, admissions or silence induces another party to believe facts; (2) the other party detrimentally relies and acts on this belief; and (3)

the other party will be prejudiced if the first party is allowed to deny the existence of the facts." *Id.* at 225. The *Antiphon* court concluded that the implied-assumption exception and estoppel could indeed be reconciled:

> We believe that the rationale underlying an application of the doctrine of estoppel and the implied agreement to assume liability exception are the same—that rationale being that a party may not, by its conduct or silence, assume a position that if maintained *would result in an injustice to another*. Accordingly, we conclude that when the trial court found that Antiphon was estoped from denying successor liability it, in actuality, was deciding that Antiphon's conduct gave rise to an implied acceptance of liability and that LEP was reasonable in relying on this implied acceptance *to its detriment*.

*Id.* (emphases added). Combining the exceptions and estoppel doctrine, the *Antiphon* court thus held that a party can recover when it reasonably relies to its detriment on an apparent acceptance of liability. *Id.* In *Antiphon*, LEP reasonably relied to its detriment on the apparent transfer of liability from Seamco to Antiphon when LEP forewent certain remedies against Seamco and Seamco ultimately dissolved. The district court in the instant case did not say the same about Scarff Bros. Bischer Farms, Inc. is an extant and operational corporation. Scarff Bros. was able to bring suit against Bischer Farms, Inc. And there is no indication that the corporation is judgment-proof. *See Traverse City Auto Mall v. Wolverine Auto Supply, Inc.*, Nos. 226824, 227554, 2002 WL 1797252, at \*2 (Mich. Ct. App. Aug. 2, 2002) (unpublished opinion) (reading *Antiphon* as "stating that a court of equity should imply an assumption of liability by a successor corporation if the facts show that the predecessor is uncollectible . . ."). On remand, if the district court finds that a transfer of assets took place, it should not find Bischer Farms Partnership successively liable unless it also finds that Scarff Bros. will be prejudiced if it is limited to recovering against Bischer Farms, Inc.